## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF ST. LOUIS, *et al.*, | Case No. 2:20-cv-04813 |
| Plaintiffs, | Chief Judge Algenon L. Marbley |
| v. | Magistrate Judge Kimberly A. Jolson |
| CHARLES E. JONES, *et al.*, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| FIRSTENERGY CORP., | |
| Nominal Defendant. | |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, AN AWARD OF ATTORNEYS' FEES AND EXPENSES, AND PLAINTIFF SERVICE AWARDS

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   BACKGROUND OF THE LITIGATION ................................................... 5

      A.    FirstEnergy's Bribery Scandal and the Ensuing Derivative Actions ..................... 5

      B.    Plaintiffs' Allegations and the Court's Motion to Dismiss Opinion ...................... 7

      C.    Defendants Create the SLC, Which Immediately Seeks to Stay this Action .......... 9

      D.    Plaintiffs Take Extensive, Contested Discovery .................................................. 11

      E.    The Settlement Negotiations ................................................................................ 14

      F.    Preliminary Approval, Notice, and Implementation ............................................ 16

      G.    Subsequent Parallel Proceedings in the Northern District and State
            Court Actions ..................................................................................................... 17

III.  SETTLEMENT TERMS ........................................................................... 19

      A.    Summary of the Terms of Settlement .................................................................. 19

      B.    The Specific Governance Reforms Secured By the Settlement ............................ 20

            1.    The Departures of Six Defendant Directors and the Creation of a
                  Newly Independent and Refreshed Board for FirstEnergy ........................ 21

            2.    The New Board's Review of FirstEnergy's Senior Executive Team ......... 23

            3.    The New Board's Commitment to Oversee FirstEnergy's Political
                  and Lobbying Activities and be Held Accountable in Connection
                  Therewith ................................................................................................. 24

            4.    FirstEnergy's Commitment to Enhanced Public Disclosures
                  Concerning the Company's Lobbying and Political Activities ................... 25

            5.    FirstEnergy's Alignment of Senior Executives' Financial
                  Incentives with Proactive Compliance with Legal and Ethical
                  Obligations .............................................................................................. 26

IV.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
      ADEQUATE AND SHOULD BE APPROVED .......................................... 27

      A.    The Legal Standards Governing Final Approval .................................................. 27

In determining whether to grant final approval of a derivative settlement, the Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–6 (6th Cir. 1992)). In assessing whether the proposed settlement is "fair, reasonable, and adequate," courts consider seven factors: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of representative counsel and the representative parties; (6) the reaction of absent class members (or, in a derivative suit, other shareholders); and (7) the public interest. *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 244 (6th Cir. 2011). For derivative cases, the "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *City of Plantation Police Officers' Emps. Ret. Sys. v. Jeffries*, 2014 WL 7404000, at *5. (S.D. Ohio Dec. 30, 2014).

B.    The Substantial Benefits for FirstEnergy Achieved by the Settlement
      Favor Approval ................................................................................................... 28

The Settlement creates immense benefits for FirstEnergy through extraordinary corporate governance improvements and an historic monetary recovery. The Settlement requires a complete and revolutionary overhaul of FirstEnergy's Board, placing ultimate control over the affairs of the Company into the hands of new independent directors. The Settlement also ensures that FirstEnergy's newly refreshed Board will conduct a thorough and independent review of the Company's most senior executives, and mandates numerous reforms to FirstEnergy's political spending and lobbying practices, and disclosure policies. The governance improvements will create significant, extensive, and long-lasting value for FirstEnergy and its public shareholders. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–6 (6th Cir. 1992); *see also Rudi v. Wexner*, No. 2:20-CV-3068, 2022 WL 1682297, at *1–2, 6 (S.D. Ohio May 16, 2022). In addition, the $180 million monetary recovery, the largest monetary recovery in the Sixth Circuit for a derivative case, compares favorably with other derivative settlements and with the potential damages in this case. *In re Community Health Sys., Inc. S'holder Deriv.* Litig., No. 11-cv-00489 (M.D. Tenn. Jan. 17, 2017); *In re Cardinal Health, Inc. Deriv. Litig.*, No. 2:19-cv-2491 (S.D. Ohio, May 25, 2022), ECF No. 100; *In re Boeing Company Derivative Litigation*, C.A. No. 2019-0907-MTZ, Tr. at 68, 94 (Del. Ch. Feb. 23, 2022); *In re Wells Fargo & Company S'holder Deriv. Litig.*, No. 16-CV-05541-JST, 2019 WL 13020734, at *6 (N.D. Cal. May 14, 2019).

C.    The Parties' Arm's-Length Mediation Process Favors Approval......................... 33

The Settlement resulted from a vigorous, hard-fought mediation process between experienced counsel and overseen by a highly experienced mediator. There is no suggestion of fraud or collusion and the participation of an experienced mediator weighs in favor of approval. *Bailey v. AK Steel Corp.*, 2008 WL 495539, at *4 (S.D. Ohio Feb. 21, 2008); *In re Wendy's Co. S'holder Deriv. Action*, Case No. 16-cv-1153, 2020 WL 13169460, at *7 (S.D. Ohio Jan. 24, 2020).

D.    The Likely Complexity, Expense, and Duration of Further Litigation
      Favors Approval................................................................................................... 34

Shareholder derivative actions are "notoriously difficult and unpredictable." *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–6 (6th Cir. 1992) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983). Further litigation of the Action would bring significant procedural, legal and factual obstacles that pose significant risks to Plaintiffs including high evidentiary standards under Ohio law and uncertaininties in connection with the proof of damages. *See* Ohio Rev. Code §§ 1701.59(E) and 1701.641(D). The cost and expense of continued litigation involving potentially dozens of depositions, extensive motion practice, expert discovery, and a lengthy trial and possible appeals, would erode the available insurance, further supporting settlement. Further, the existence of the SLC and the possibility that the SLC could recommend dismissal of some or all of Plaintiffs' claims created additionl risk.

E.      The Likelihood of Success on the Merits Favors Final Approval ........................ 39

Plaintiffs faced significant risks, including: (i) the difficulty of establishing breach of fiduciary duty claims under Ohio law under the "clear and convincing evidence" standard; (ii) proof of certain damages; (iii) the risk that Defendants' wasting insurance policies would be depleted by the significant cost of ongoing litigation; (iv) the risk that the SLC would recommend dismissal of some or all of the claims; and (v) the risk of an appeal, including on issues with respect to liability of the Director Defendants under Section 14(a) of the Exchange Act. The immediacy and certainty of a substantial recovery, including governance reforms only achievable through a negotiated settlement, favor approval when balanced against the risks of further litigation. *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *2 (S.D. Ohio Aug. 19, 2009).

F.      Plaintiffs' Development of an Extensive Discovery Record Favors
        Approval ........................................................................................................... 40

Plaintiffs conducted extensive discovery, providing an ample record for assessing the merits of the case and adequacy of the Settlement. *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *5 (S.D. Ohio Aug. 19, 2009)*.*

G.      The Support of Plaintiffs and Their Experienced Counsel Favor Settlement....... 41

Plaintiffs' counsel have extensive experience in litigating complex shareholder derivative cases and they represent sophisticated institutional investors who are experienced in overseeing stockholder derivative litigation. Both well-informed Plaintiffs and their counsel support the Settlement. Courts will generally defer to the judgment of experienced counsel to settle a case, particularly when there has been significant discovery. *Bronson v. Board of Educ.*, 604 F. Supp. 68, 73 (S.D. Ohio 1984).

H.      The Reaction of Absent Shareholders Favors Final Approval ............................ 42

To date, no FirstEnergy stockholder has objected to the proposed Settlement, which further supports final approval of the Settlement.

I.      The Public Interest Favors Approval .................................................................. 42

Cases in the Sixth Circuit recognize the significant public interest in settling complex and unpredictable litigation. *Bailey v. AK Steel Corp*., 2008 WL 495539, at *4 (S.D. Ohio Feb. 21, 2008); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–6 (6th Cir. 1992). The Settlement here, which includes both a large monetary recovery and significant corporate governance benefits, serves the public interest by ensuring that FirstEnergy remains a stable and trustworthy Company that will restore confidence in its stockholders, regulators and customers.

V.     THE REQUESTED FEE AND EXPENSE AWARD IS FAIR AND
       REASONABLE AND SHOULD BE APPROVED ......................................................... 43

The requested Fee and Expense Award for Plaintiffs' counsel in the amount of $48.6 million — representing 27% of the $180 million monetary benefit achieved—is fully justified by the historic benefits achieved by counsel and the work performed.

       A.     The Legal Standard Governing Fee Applications.................................................. 44

Courts in the Sixth Circuit conduct a two-part analysis when assessing the reasonableness of a fee petition. *Rikos v. Proctor & Gamble Co.,* No. 1:11-CV-226, 2018 WL 2009681, at *8 (S.D. Ohio Apr. 30, 2018) (citing *In re Cardinal Health Inc. Sec. Litig.*, 528 F.Supp.2d 752, 760 (S.D. Ohio 2007)). First, the court determines the method for calculating fees, and the preferred method is "to award a reasonable percentage of the fund, with reference to the lodestar and the resulting multiplier." *See e.g., Rikos*, 2018 WL 2009681, at *8 (quoting *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 08-cv-1119, 2011 WL 292008, at *13 (S.D. Ohio Jan. 26, 2011). Second, the court must analyze the six factors set forth by the Sixth Circuit in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974), which are: (1) the value of the benefit rendered to the corporation or its stockholders, (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of counsel involved on both sides. Each of the *Ramey* factors, discussed below, support the requested Fee and Expense Award

       B.     The Benefits Achieved by Counsel Support the Requested Fee and
              Expense Award .................................................................................................. 44

By securing a Settlement that creates immense monetary and non-monetary benefits for FirstEnergy, Plaintiffs' counsel satisfied the first *Ramey* factor concerning the value of the benefit rendered. As a result, Plaintiffs' counsel seek a total Fee and Expense Award totaling 27% of the $180 million monetary recovery achieved. Plaintiffs' counsel's request for 27% of the common fund created is in line with Sixth Circuit precedent, and is lower than the 33.3% awarded in the prior largest derivative settlement in the Sixth Circuit. *See, e.g., In re Community Health Sys., Inc. S'holder Litig.*, Case No. 3:11-cv-00489 (M.D. Tenn. Jan. 1, 2017); *see also Pfizer*, 780 F. Supp. 2d at 344 (granting award amounting to 29.3% of $75 million monetary recovery in derivative settlement also involving governance reforms); *Cummings v. Edens, et al.*, No. 13007-VCS (Del. Ch. July 31, 2019) (granting award amounting to 27.4% of $53 million monetary recovery in derivative settlement also involving governance reforms). Plaintiffs' counsel's requested Fee and

Expense Award is also particularly appropriate when considering the significant benefit conferred on FirstEnergy as a result of the specific Reforms achieved by the Settlement, which are of sufficient magnitude to warrant a significant fee even standing alone.

C.      The Requested Fee and Expense Award is Consistent with the Public
         Interest ............................................................................................................. 49

The second *Ramey* factor requires the requested Fee and Expense Award to be consistent with the public interest, and it is because courts routinely recognize that rewarding attorneys who prosecute shareholder derivative actions is important to the public interest and that awarded fees should adequately compensate private plaintiffs' attorneys, taking into account the substantial economic risks undertaken by counsel. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007).

D.      Plaintiffs' Counsel Prosecuted Plaintiffs' Claims on a Wholly-Contingent
         Basis ................................................................................................................. 50

The third *Ramey* factor looks at the risk that the attorneys will not recovery compensation for the work they put into a case. Plaintiffs' counsel undertook the prosecution of this Action on a wholly contingent basis, advancing all expenses, and then vigorously prosecuted it for over 18 months before settling on exceptionally favorable terms to FirstEnergy and its shareholders, supporting the requested Fee and Expense Award.

E.      Counsel's Time and Effort Expended Support the Requested Fee and
         Expense Award ................................................................................................. 50

The fourth *Ramey* factor also supports the requested Fee and Expense Award because the request is reasonable when cross-checked against Plaintiffs' counsel's lodestar. The Joint Declaration details the substantial time and effort that Plaintiffs' counsel devoted to prosecuting this case. The requested Fee and Expense Award equates to a total lodestar multiplier for all counsel of 3.54, which is well within the range of multipliers typically approved by courts in shareholder derivative and class action matters. *See, e.g., In re Cardinal Health,* 528 F.Supp.2d at 767 (approving 5.9 multiplier)*; Arp v. Hohla & Wyss Enterprises, LLC,* No. 3:18-CV-119, 2020 WL 6498956, at *7 (S.D. Ohio Nov. 5, 2020) (approving 5.29 multiplier); *Lowther v. AK Steel Corp.,* No. 1:11-cv-877, 2012 WL 6676131, at *5 (S.D. Ohio Dec. 21, 2012) (approving 3.06 multiplier and citing cases with multipliers ranging from 4.3 to 8.5). The number of hours expended and the hourly rates charged by all plaintiffs' counsel are reasonable. *See Karpik,* 2021 WL 757123, at *10 (approving hourly rates for partners up to $875 in an ERISA class action based on the prevailing rates of similarly specialized ERISA counsel); *Big Lots,* 2018 WL 11356561, at *5 (approving hourly rates of up to $925 for partners and $650 for associates for out-of-town counsel), *L Brands*, 2022 WL 1682297, at *5 (approving hourly rates of up to $1,685 for partners and $1,245 for associates).

F.      The Complexity of the Litigation Supports the Requested Fee and Expense
         Award ................................................................................................................ 53

The fifth *Ramey* factor concerning the complexity of the litigation supports the requested Fee and Expense Award because Plaintiffs identified a number of risks inherent in proceeding with this complex litigation, including: (1) the difficulty of litigating director oversight claims in general, and in particular Ohio's "clear and convincing evidence" standard for director and officer breach of fiduciary duty claims; (2) other Ohio statutory protections for director and officer conduct, (3) difficulties in ascertaining damages; (3) recoverability issues based on eroding D&O insurance; (4) the possibility that the SLC could recommend termination of some or all of Plaintiffs' claims; and (5) other risks inherent in complex litigation, like motions for summary judgment, battles of the experts, a lengthy trail and post-trial litigation.

G.      The Involvement of Highly Experienced Counsel Supports the Requested
        Fee and Expense Award......................................................................................... 53

The sixth *Ramey* factor supports the requested Fee and Expense Award because counsel are highly experienced and skilled practitioners in the field of securities litigation, and the firms have long and successful track records in derivative and securities litigation.  *See, e.g., Nationwide*, 2009 WL 8747486, at *7, 15 (noting "highly experienced" plaintiffs' counsel, coupled with a "formidable opposition [including] very skilled and experience counsel in securities and transactional litigation, who could draw upon the exceptional resources of their national recognized law firm[ ] . . . [are] factor[s] that may be considered when evaluating a fee request.").

VI.     THE REQUESTED SERVICE AWARDS ARE APPROPRIATE AND SHOULD
        BE APPROVED ........................................................................................................ 54

Plaintiffs' request for Service Awards is appropriate and commensurate with their active participation in the prosecution of the case.  "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  *L Brands*, 2022 WL 1682297, at *6 (quoting *Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933, at *7 (N.D. Ohio Mar. 8, 2010).  The Service Awards requested are reasonable when compared with other awards. *See, e.g.*, *L Brands*, 2022 WL 1682297, at *6.

VII.    CONCLUSION............................................................................................................ 56

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Activision Blizzard, Inc. S'holder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015)................................................................28, 29, 53

*In re Alphabet Inc., S'holder Deriv. Litig.*,
    No. 19-CV- 341522 (Cal. Super. Ct., Santa Clara Cty. Nov. 30, 2020)..................................29

*In re Alphabet Inc., S'holder Deriv. Litig.*,
    No. 19-CV-341522 (Cal. Super. Ct., Santa Clara Cnty.  Feb. 5, 2021)..................................48

*In re Apollo Grp. Inc. Sec. Litig.*,
    No. CV 04-2147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ............................45

*Arp v. Hohla & Wyss Enters., LLC*,
    No. 3:18-CV-119, 2020 WL 6498956 (S.D. Ohio Nov. 5, 2020) ..........................................51

*Bailey v. AK Steel Corp.*,
    2008 WL 495539 (S.D. Ohio Feb. 21, 2008)................................................................33, 40, 42

*Berry v. School Dist.*,
    184 F.R.D. 93 (W.D. Mich. 1998)..........................................................................................40

*In re Big Lots, Inc. S'holder Litig.*,
    No. 2:12-cv-00445, 2018 WL 11356561 (S.D. Ohio Aug 28, 2018) ............................ *passim*

*Bloom v. Anderson*,
    2:20-cv-04534, 2020 WL 6737655 (S.D. Ohio Nov. 17, 2020) ...............................................6

*Bloom v. Anderson*,
    No. 2:20-cv-04534, 2020 WL 6710429 (S.D. Ohio Nov. 16, 2020) ...................................6, 51

*In re Boeing Co. Deriv. Litig.*,
    C.A. No. 2019-0907-MTZ (Del. Ch. Feb. 23, 2022)....................................................31, 32, 46

*Bowling v. Pfizer, Inc.*,
    922 F. Supp. 1261 (S.D. Ohio 1996) .....................................................................................49

*Bronson v. Board of Educ.*,
    604 F. Supp. 68 (S.D. Ohio 1984) ..........................................................................................40

*In re Cardinal Health, Inc. Deriv. Litig.*,
    No. 2:19-cv-02491, 2021 WL 425966 (S.D. Ohio Feb. 8, 2021) ........................................8, 30

*In re Cardinal Health Inc. Sec. Litig.*,
  528 F.Supp.2d 752 (S.D. Ohio 2007) ............................................................ *passim*

*In re Caremark Int'l Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996)............................................................................35

*City of Monroe Emps.' Ret. Sys. v. Murdoch et al.*,
  No. 2017-0833-AGB (Del. Ch. Nov. 20, 2017)..................................................46

*City of Plantation Police Officers' Emps. Ret. Sys. v. Jeffries*,
  No. 2:14-cv-01380, 2014 WL 7404000 (S.D. Ohio Dec. 30, 2014).....................27

*City of Pontiac General Emps. Ret. Sys. v. Wal-Mart Stores*,
  No. 5:12-cv-5162, 2019 WL 1529517 (W.D. Ark. Apr. 8, 2019) .........................45

*In re Community Health Sys., Inc. S'holder Litig.*,
  No. 3:11-cv-00489, slip op. (M.D. Tenn. Jan. 1, 2017).............................30, 45, 46

*Connectivity Sys. Inc. v. Nat'l City Bank*,
  No. 08-cv-1119, 2011 WL 292008 (S.D. Ohio Jan. 26, 2011)........................44, 50

*Cumming v. Edens, et al.*,
  No. 13007-VCS, slip op. (Del. Ch. July 31, 2019) ..................................................46

*Dillworth v. Case Farms Processing, Inc.*,
  No. 5:08-cv-01694, 2010 WL 776933 (N.D. Ohio Mar. 8, 2010).........................54

*Emp. Ret. Sys. of City of St. Louis v. Jones*,
  No. 2:20-cv-04813, 2021 WL 1890490 (S.D. Ohio May 11, 2021)........................8

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
  No. 2:20-cv-04813, 2020 WL 7487839 (S.D. Ohio Dec. 21, 2020).........................7

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
  No. 2:20-cv-04813, 2021 WL 5275827 (S.D. Ohio Nov. 12, 2021) .........................9

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
  Nos. 21-3993/4041, 2021 WL 6067034 (6th Cir. Dec. 16, 2021) ........................11

*In re Facebook Inc. Class C. Reclassification*,
  C.A. No. 12286-VCL, slip op. (Del. Ch. Oct. 24, 2018) ......................................47

*In re Galena Biopharma, Inc. Deriv. Litig.*,
  No. 14-cv-00516, 2016 WL 10840600 (D. Or. June 24, 2016)..............................37

*Gascho v. Glob. Fitness Holdings, LLC*,
No. 2:11-CV-436, 2014 WL 1350509 (S.D. Ohio Apr. 4, 2014), *report and recommendation adopted*, No. 2:11-CV-00436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269 (6th Cir. 2016)................................................................41

*Genrich v. Anderson, et al.*,
No. CV-2020-07-2107, slip op. (Ohio Ct. C.P. Feb. 21, 2022)................................18

*In re Genworth Fin. Inc. Sec. Litig.*,
No. 3:14-cv-682, 2016 WL 7187290 (E.D. Va. Sep. 26, 2016)................................45

*Gilbert v. Abercrombie & Fitch, Co.*,
No. 2:15-CV-2854, 2016 WL 4159682 (S.D. Ohio Aug. 5, 2016), *report and recommendation adopted*, No. 2:15-CV-2854, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) ................................................................50, 51

*In re Google Inc. Class C S'holder Litig.*,
Cons. C.A. No. 7469–CS (Del. Ch. Oct. 28, 2013) ................................................48

*Grae v. Corr. Corp. of Am.*,
No. 3:16-CV-02267, 2021 WL 5234966 (M.D. Tenn. Nov. 8, 2021)....................45

*Granada Invs., Inc. v. DWG Corp.*,
962 F.2d 1203 (6th Cir. 1992) ................................................................ *passim*

*Hadix v. Johnson*,
322 F.3d 895 (6th Cir. 2003) ................................................................54

*Hainey v. Parrott*,
617 F. Supp. 2d 668 (S.D. Ohio 2007) ................................................................41

*Karpik v. Huntington Bancshares Inc.*,
No. 2:17-cv-1153, 2021 WL 757123 (S.D. Ohio) ................................45, 51, 52

*Lowther v. AK Steel Corp.*,
No. 1:11-cv-877, 2012 WL 6676131 (S.D. Ohio Dec. 21, 2012)..........................51

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) ................................................................34, 42, 47

*McDannold v. Star Bank, N.A.*,
261 F.3d 478 (6th Cir. 2001) ................................................................27

*In re McKesson Corp. Deriv. Litig.*,
No. 4:17-cv-01850-CW, slip op. (N.D. Cal. Apr. 22, 2020) ................................46

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
No. 08-cv-2177, 2013 WL 5505744 (D.N.J. Aug. 1, 2013) ................................45

– ix –

*Miller v. Anderson*,
2021 WL 4220780 (N.D. Ohio Sept. 16, 2021)........................................................9

*Miller v. Anderson*,
2021 WL 2255516 (N.D. Ohio May 13, 2021)..................................................9, 10

*Miller v. Bargaheiser*,
70 Ohio App. 3d 702, 591 N.E.2d 1339 (1990).....................................................38

*Moore v. Aerotek, Inc.*,
No. 2:15-CV-2701, 2017 WL 2838148 (S.D. Ohio June 30, 2017), *report and recommendation adopted,* No. 2:15-CV-2701, 2017 WL 3142403 (S.D. Ohio July 25, 2017)...........................................................................................................44

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp*,
No. 08 CIV. 5310 (DAB), 2019 WL 13150344 (S.D.N.Y. Mar. 8, 2019), *aff'd as modified sub nom. New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.,* 28 F.4th 357 (2d Cir. 2022) ..............................................................45

*In re Nationwide Fin. Servs. Litig.*,
No. 2:08-CV-00249, 2009 WL 8747486 (S.D. Ohio Aug. 19, 2009) .................... *passim*

*In re Pacific Enters., Sec. Litig.*,
47 F. 3d 373 (9th Cir. 1995) .................................................................................34

*Peace Officers' Annuity & Benefit Fund of Ga v. Davita, Inc. et. al.*,
No. 17-CV-0304-WJM-NRN, 2021 WL 2981970 (D. Colo. July 15, 2021) .........45

*In re Pfizer Inc. S'holder Deriv. Litig.*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011)...................................................29, 31, 45, 47

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*,
636 F.3d 235 (6th Cir. 2011) ................................................................................27

*Ramey v. Cincinnati Enquirer, Inc.*,
508 F.2d 1188 (6th Cir. 1974) .........................................................................44, 49

*Rikos v. Proctor & Gamble Co.*,
No. 1:11-CV-226, 2018 WL 2009681 (S.D. Ohio Apr. 30, 2018) ....................43, 44

*Rotondo v. JPMorgan Chase Bank, N.A.*,
No. 2:19-CV-2328, 2019 WL 6167086 (S.D. Ohio Nov. 20, 2019), *report and recommendation adopted*, No. 19-CV-02328, 2019 WL 6496806 (S.D. Ohio Dec. 2, 2019)...........................................................................................................55

*Rudi v. Wexner*,
No. 2:20-CV-3068, 2022 WL 1682297 (S.D. Ohio May 16, 2022)................. *passim*

*Schuh v. HCA Holdings, Inc.*,
  No. 3:11-CV-01033, 2016 WL 10570957 (M.D. Tenn. Apr. 14, 2016)................................45

*In re Se. Milk Antitrust Litig.*,
  No. 2:07-CV-208, 2012 WL 2236692 (E.D. Tenn. June 15, 2012) .......................................41

*Silverman v. Motorola Inc.*,
  1:07-cv-04507, 2012 WL 1597388 (N.D. Ill. 2012).............................................................45

*In re Sumitomo Copper Litig.*,
  189 F.R.D. 274 (S.D.N.Y. 1999) ........................................................................................41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................................49

*Thacker v. Chesapeake Appalachia, L.L.C.*,
  695 F. Supp. 2d 521 (E.D. Ky. 2010), *aff'd sub nom., Poplar Creek Dev. Co.*
  *v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235 (6th Cir. 2011)..........................................38

*Unite Nat. Ret. Fund v. Watts*,
  No. Civ.A 04CV3603DMC, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ...............................34

*Voulgaris v. Array Biopharma Inc.*,
  No. 17-cv-02789, 2021 WL 6331178 (D. Colo. Dec. 3, 2021) ..............................................34

*In re Walt Disney Co. Deriv. Litig.*,
  907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)..............................................49

*In re Wells Fargo & Company*,
  No. 4:16-cv-05551-JST (N.D. Cal. Apr. 2, 2019) ..................................................................33

*In re Wells Fargo & Company S'holder Deriv. Litig.*,
  No. 16-CV-05541-JST, 2019 WL 13020734 (N.D. Cal. May 14, 2019) ........................31, 46

*In re Wendy's Co. S'holder Deriv. Action*,
  No. 16-cv-1153, 2020 WL 13169460 (S.D. Ohio Jan. 24, 2020)...........................................34

*Williams v. Vukovich*,
  720 F.2d 909 (6th Cir. 1983) ..............................................................................................41

*In re Wilmington Trust Sec. Litig.*,
  No. 10-cv-0990, 2018 WL 6046452 (D. Del. Nov. 19, 2018)................................................45

*Worthington v. CDW Corp.*,
  No. 1:03-cv-00649, 2006 WL 8411650 (S.D. Ohio May 22, 2006)........................................45

*In re Yahoo! S'holders Litig.*,
  C.A. 3561–CC, slip op. (Del. Ch. Mar. 6, 2009) ..................................................................48

*Zapata Corp. v. Maldonado,*
   430 A.2d 779 (Del. 1981) ........................................................................38

**STATUTES**

Ohio Rev. Code §§ 1701.59(C) ...............................................................35, 36

Ohio Rev. Code §§ 1701.59(E) and 1701.641(D) ........................................35

**OTHER AUTHORITIES**

7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
   1839 (3d ed. 2014) ...............................................................................27

Jessica Erickson, *Corporate Governance in the Courtroom: An Empirical
   Analysis*, 51 WM. & MARY L. REV. 1749 (2010) ...................................29

Kevin LaCroix , *Largest Derivative Lawsuit Settlements*, THE D&O DIARY
   (updated June 13, 2022) ........................................................................30

NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation:
   2021 Full-Year Review*, (2022) .............................................................32

Court-appointed Co-Lead Plaintiffs Employees Retirement System of the City of St. Louis ("St. Louis") and Electrical Workers Pension Fund, Local 103, I.B.E.W ("Local 103"), together with additional Plaintiff Massachusetts Laborers Pension Fund ("MLPF," and collectively with "Co-Lead Plaintiffs," "Plaintiffs"), respectfully submit this Motion for Final Approval of Settlement, an Award of Attorneys' Fees and Expenses, and Plaintiff Service Awards.

## I.    PRELIMINARY STATEMENT

Through this action, Plaintiffs sought: (i) to remediate the financial harm incurred by FirstEnergy as a result of its involvement in a corrupt scheme to bribe public officials perpetrated and overseen by the Defendants; and (ii) to reform FirstEnergy's internal governance to deter and prevent the recurrence of similar misconduct and promote FirstEnergy's compliance with relevant laws and regulations going forward.  Plaintiffs aggressively pursued these twin aims across more than eighteen months of fiercely-contested litigation spanning multiple trial courts and the United States Court of Appeals for the Sixth Circuit.  Plaintiffs faced exacting, and in some cases largely untested, legal standards for both pleading and proving their claims and were opposed at every turn by a veritable army of top-shelf defense attorneys assembled by Defendants and the Special Litigation Committee ("SLC"), who stopped at nothing in their attempt to shut this litigation down. But Plaintiffs prevailed.  Plaintiffs defeated serial motions to dismiss or stay the litigation in two separate trial courts, defeated a motion to certify an interlocutory appeal of this Court's order denying Defendants' motions to dismiss, defeated appeals of both this Court's and the Northern District of Ohio's orders denying the SLC's stay motions, won orders compelling the production of discovery, and ultimately secured an extensive documentary record that was notably broader than even the production secured by the United States Department of Justice ("DOJ") before it entered into its own Deferred Prosecution Agreement ("DPA") with FirstEnergy in connection with the corrupt scheme giving rise to this litigation.  Plaintiffs then marshalled that extensive

discovery record in an arm's-length mediation process and highly-contentious subsequent negotiations facilitated and overseen by one of the nation's preeminent mediators, retired United States District Judge Layn R. Phillips, to secure the Settlement.  The Settlement achieves Plaintiffs' twin aims and is by any measure historic.

First, the Settlement secures FirstEnergy's agreement to enact internal governance reforms of a magnitude that Plaintiffs believe to be unprecedented.  Indeed, the reforms provide for a sweeping overhaul constituting what is in effect a revolution for the management and internal governance of FirstEnergy—a massive company with tens of billions of dollars in market capitalization, thousands of employees, and millions of customers.  The Settlement includes the departures of *six* Defendant directors from FirstEnergy's Board of Directors (the "Board").  As a result, FirstEnergy is now governed by a twelve-member Board controlled by a supermajority of independent directors who joined the Board after the revelation of the scheme giving rise to this action.  Further, pursuant to the Settlement, FirstEnergy's new Board will be required to perform an in-depth review of FirstEnergy's entire senior executive team to determine whether those executives should be permitted to remain.  Specifically, the Settlement requires a special committee of independent directors to promptly review the Company's entire C-Suite and make recommendations concerning the performance of each C-Suite executive, including as to their potential involvement in the bribery scheme.  Thereafter, the full Board, consisting of a supermajority of new and independent directors, will be tasked with making a final affirmative determination as to whether each executive should be permitted to remain with FirstEnergy.  The Settlement, moreover, also implements numerous procedural reforms designed to deter and prevent the recurrence of misconduct in connection with FirstEnergy's lobbying and political activities.  It requires the Board to take active responsibility for overseeing those activities,

– 2 –

including the review and affirmative approval of the Company's political spending and lobbying plan by the Board and direct oversight of the plan's implementation by a Board committee with direct access to FirstEnergy's Chief Legal Officer and Chief Ethics and Compliance Officer. Ensuring accountability, the Settlement also requires enhanced public disclosure concerning political spending and lobbying activities in FirstEnergy's annual proxy statements, including reports by an independent third-party auditor. These governance reforms are detailed further below and in the accompanying declaration of Columbia Law School Professor Jeffrey N. Gordon, a widely-respected corporate governance expert and the architect of the reform program enacted by the Settlement. As Professor Gordon explains, these reforms will help FirstEnergy move past the scandal that has engulfed the Company in recent years by: (i) restoring confidence among shareholders and other stakeholders; (ii) giving the new Board tools to take ownership over FirstEnergy's political and lobbying activities; and (iii) ensuring FirstEnergy's shareholders are able to monitor and hold the Board accountable going forward. Notably, these immense governance benefits could not have been achieved through a post-trial judgement, but rather were available only through a negotiated resolution.

Second, the Settlement pairs these historic governance reforms with a monetary recovery for FirstEnergy that is likewise historic and exceeds any recovery Plaintiffs could reasonably have expected to secure through trial. Specifically, the Settlement achieves for FirstEnergy one of the largest cash recoveries in the history of shareholder derivative litigation: $180 million. This recovery: (i) compares extremely favorably to precedent, representing the largest shareholder derivative recovery in the history of the Sixth Circuit by a wide margin; (ii) captures a significant percentage of total potential damages in the case, including a full 78.26% of the principal government penalty incurred as a result of the bribery scheme (the $230 million penalty paid by

– 3 –

FirstEnergy pursuant to its DPA with the DOJ); and (iii) captures a full 81.81% of Defendants' available insurance coverage at the time of Settlement (approximately $220 million). Significantly, Plaintiffs reasonably determined that Defendants' insurance coverage—which was subject to erosion to pay defense costs and settlements in this action as well as defense costs and potential settlements in other related actions—represented the primary source of any recovery on the scale of the damages alleged. Therefore, pressing further litigation in lieu of the Settlement would have not only required Plaintiffs to forgo securing the substantial governance reforms achieved by the Settlement, but also risked substantial erosion of the relevant policies, in which case even a post-trial judgment in excess of $180 million—something that Plaintiffs hoped to achieve, but that was far from certain—might very well have been unrecoverable. The Settlement locks in a guaranteed $180 million recovery now, while also allowing FirstEnergy and its newly refreshed and reformed Board to move past the bribery scandal and avoid the uncertainties and distractions of continued litigation that otherwise might have weighed on the Company for years to come. In sum, there is no question that the Settlement is in the best interests of FirstEnergy.

The Settlement constitutes an exceptional outcome for FirstEnergy and results from fiercely-contested litigation, extensive discovery, and arm's-length negotiations facilitated by an esteemed mediator. It meets all of the standards for approval and is fully supported by Plaintiffs in this action as well as all plaintiffs in the parallel actions pending in Ohio state court and in the Northern District of Ohio (collectively, the "Derivative Actions"), all of which will be resolved if the Settlement is approved. On May 11, 2022, the Court preliminarily approved the Settlement and approved a plan of notice to FirstEnergy's absent shareholders. Notice has been provided and, to date, no shareholder has lodged any objection. Plaintiffs now respectfully seek an order granting final approval of the Settlement.

Plaintiffs also respectfully seek a total Fee and Expense Award for counsel, who have litigated this action since its inception on a completely contingent basis, in the amount of $48.6 million—representing 27% of the $180 million monetary benefit achieved.  As explained herein, such a Fee and Expense Award is fully justified by the work performed by counsel in this litigation and the historic benefits achieved as a result thereof.  Finally, Plaintiffs also seek approval for relatively modest Service Awards in the amount of $10,000 to be paid to each Plaintiff (as well as the named plaintiff in the Northern District Action and the lead plaintiffs in the State Court Action) out of counsel's Fee and Expense Award, to compensate these shareholders for stepping forward and dedicating their own time, energy, and resources to the historically successful prosecution of this matter on behalf of FirstEnergy and all of its public shareholders.

## II.    BACKGROUND OF THE LITIGATION[1]

### A.    FirstEnergy's Bribery Scandal and the Ensuing Derivative Actions

In July 2020, the DOJ filed a criminal complaint against former Ohio Speaker of the House Larry Householder ("Householder") and two FirstEnergy lobbyists, detailing a "sophisticated criminal conspiracy" in which FirstEnergy executives funneled more than $60 million in illicit payments to public officials, including Householder, in exchange for favorable official action to address the Company's financial woes.  In announcing the complaint, the DOJ made unmistakably clear that FirstEnergy and its leaders remained the subject of investigation.  A year later, FirstEnergy would concede its criminal liability in connection with the scheme.  Specifically, on July 20, 2021, FirstEnergy entered into its DPA with the DOJ.  As part of the DPA, the Board agreed to use $230 million of FirstEnergy's money to pay a criminal penalty and admitted that

---

[1] The Joint Declaration of Jeroen van Kwawegen and Thomas Curry ("Joint Decl.") in support of this Motion further details the litigation and settlement process.  All references in this Motion to "Ex. __ " are to exhibits filed herewith.

certain FirstEnergy executives had engaged in blatant criminal misconduct, "*conspir[ing] ... to pay millions of dollars to and for the benefit of public officials in exchange for specific official action*" (emphasis added).[2]

In the meantime, between August and November of 2020, Plaintiffs and other FirstEnergy shareholders commenced numerous derivative suits seeking to hold FirstEnergy officers and directors accountable for the harm incurred by the Company as a result of their involvement in the bribery scheme. Nine such actions were filed in this Court and were subsequently consolidated into this action, with St. Louis and Local 103 appointed to serve as Co-Lead Plaintiffs and their counsel at Saxena White P.A. and Bernstein Litowitz Berger & Grossmann LLP appointed to serve as Co-Lead Counsel. *See* ECF No. 44, reported at *Bloom v. Anderson*, 2020 WL 6710429 (S.D. Ohio Nov. 16, 2020) (appointing leadership structure); ECF No. 45, reported at *Bloom v. Anderson*, 2020 WL 6737655 (S.D. Ohio Nov. 17, 2020) (consolidating subsequently filed derivative suit into this action).

One additional action was filed in the Northern District of Ohio (the "Northern District Action" or "NDA");[3] and two additional actions were filed and subsequently consolidated in the Court of Common Pleas for Summit County (the "State Court Action").[4] In October 2020, Plaintiffs moved to intervene in the Northern District Action for purposes of having it transferred for consolidation in this Court, where all other federal derivative suits were filed. Joint Decl., ¶22. Defendants responded by opposing transfer of the Northern District Action and instead seeking to

---

[2] DPA at 18, available at: https://www.sec.gov/Archives/edgar/data/1031296//ex101-8k7x22x21.htm (last visited July 7, 2022).

[3] The Northern District Action is captioned *Miller v. Anderson et al.*, Case No. 5:20-cv-01743 (N.D. Ohio).

[4] The State Court Action is captioned *In re FirstEnergy Corp., Stockholder Derivative Litigation*, Case No. CV-2020-07-2107 (Ohio Ct. of Common Pleas, Summit Cnty.).

stay this action pending resolution of their motions to dismiss the Northern District Action. But this Court denied that motion, finding that the threat of "duplicative litigation," the basis on which Defendants sought a stay, was "of Defendants' own doing." ECF No. 59 at 8, reported at *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2020 WL 7487839, at *3 (S.D. Ohio Dec. 21, 2020).

### B.      Plaintiffs' Allegations and the Court's Motion to Dismiss Opinion

In advance of Plaintiffs' filing of their initial complaints, Plaintiffs' counsel investigated the government's allegations and the role of FirstEnergy's Board and senior executives in the alleged bribery scheme. In addition to the indictment and supporting documents, Counsel reviewed numerous Company filings with the Securities and Exchange Commission (the "SEC"), transcripts of calls with financial analysts, shareholder proposals seeking more comprehensive disclosure of FirstEnergy's political and lobbying activities, and public news reports. Counsel continued their factual and legal investigation following the Court's appointment of a leadership structure, reviewing additional public materials. Joint Decl., ¶25.

On January 25, 2021, following the Court's denial of Defendants' motion to stay, Plaintiffs filed their operative Consolidated Verified Shareholder Derivative Complaint (the "Complaint," ECF No. 75). The Complaint asserted breach of fiduciary duty and related state law claims under Ohio law and claims under Section 14(a) of the Securities Exchange Act of 1934 based on allegations that Defendants had implemented an illegal bribery scheme and that a majority of the Board decided not to stop the illegal conduct, reassuring shareholders instead that the Board had "strengthened its oversight over [FirstEnergy's] lobbying activities" and "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." *Id.*

On February 24, 2021, Defendants moved to dismiss this action, arguing that a pre-suit demand was not excused under Ohio law because the Board did not face a substantial likelihood

of liability.  Defendants also moved to dismiss Plaintiffs' Section 14(a) claims, arguing: (i) that Defendants were under no obligation to disclose their breaches of duty; (ii) that Plaintiffs were required to plead "scienter" to support their Section 14(a) claims; and (iii) that Plaintiffs had not demonstrated that the proxy statements issued by Director Defendants were an "essential link" in causing harm to FirstEnergy.  ECF No. 80.

On March 24, 2021, Plaintiffs filed opposition papers arguing that the Complaint adequately alleged breach of fiduciary duty claims against the Officer and Director Defendants and that it met the demand futility standards under Ohio law.  Specifically, Plaintiffs argued that the Complaint alleged particularized facts "creating a reasonable doubt that a majority of the board of directors [at the time of filing] [was] capable of making a disinterested and independent decision about whether to initiate litigation."  ECF No. 86 at 22 (citing *In re Cardinal Health, Inc. Deriv. Litig.*, 2021 WL 425966, at *12 (S.D. Ohio Feb. 8, 2021)).  Plaintiffs also argued that the Complaint stated valid proxy claims under Section 14(a) of the Securities Exchange Act because: (i) the Complaint identified multiple actionable misstatements and omissions in FirstEnergy's 2018, 2019, and 2020 proxy statements concealing the Company's bribery scheme and its effect on the Company's health, operations, and prospects; (ii) the Complaint adequately alleged that Defendants were at least negligent when they caused FirstEnergy to issue false proxies; (iii) the Complaint alleged that the misrepresentations or omissions caused shareholders to vote in favor of reelecting the directors, allowing the fraudulent scheme to continue, and (iv) the Complaint met the standard for alleging that the false and misleading proxy statements issued by the Director Defendants were an "essential link" in causing harm to FirstEnergy.  ECF No. 86 at 35–43.

On May 11, 2021 the Court denied Defendants' motions to dismiss in their entirety.  ECF No. 86 (the "MTD Opinion"), reported at *Emp. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL

1890490 (S.D. Ohio May 11, 2021).  The Court held that the Complaint adequately alleged demand futility, noting that the allegations in the Complaint supported, among other things, an inference that "a majority of the Director Defendants recklessly disregarded their duties to the Company and allowed the criminal scheme to continue unchecked." *Id.* at 21.  With respect to Plaintiffs' 14(a) claims, the Court held that "Plaintiffs make extensive and detailed allegations suggesting that the FirstEnergy Defendants issued numerous false or misleading statements through the proxies, and they provide ample reasons as to why the statements misled shareholders." *Id.* at 8.  Defendants moved to certify an interlocutory appeal of the Court's decision denying their motions to dismiss, but the Court, on November 12, 2021, denied that motion in its entirety.  ECF No. 151, reported at *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 5275827 (S.D. Ohio Nov. 12, 2021).

Two days after this Court sustained the Complaint, the Northern District of Ohio granted Plaintiffs' pending motion to intervene in the Northern District Action but denied Plaintiffs' motion to transfer the Northern District Action to this Court for consolidation into this Action, notwithstanding the spectre of duplication given that the two actions are substantively identical. NDA ECF No. 72, reported at *Miller v. Anderson*, 2021 WL 2255516 (N.D. Ohio May 13, 2021). Defendants moved to dismiss Plaintiffs' substantially identical complaint in intervention (updated to account for new developments since the Complaint) but, following further briefing, the Northern District adopted this Court's reasoning and denied Defendants' motions to dismiss the Northern District Action in their entirety.  NDA ECF No. 117, reported at *Miller v. Anderson*, 2021 WL 4220780 (N.D. Ohio Sept. 16, 2021); Joint Decl., ¶28.

### C.   Defendants Create the SLC, Which Immediately Seeks to Stay this Action

On June 30, 2021, FirstEnergy announced the Board's creation of the SLC effective July 1, 2021.  ECF No. 116.  By then, the Derivative Actions had been pending for nearly a year, and this Court had already issued its MTD Opinion denying Defendants' motions to dismiss.  That is,

the Board only created the SLC *after* this Court held that the Complaint stated actionable claims, demand was excused, and Defendants faced a substantial likelihood of liability in connection with their role in the bribery scheme. Nevertheless, on July 20, 2021, the SLC moved to stay this action, arguing that it represented FirstEnergy's interests under Ohio law and that it needed at least six months to investigate FirstEnergy's claims. ECF No. 120.

Plaintiffs' counsel have extensive experience in prosecuting shareholder derivative claims and have frequently encountered special litigation committees. Joint Decl., ¶29. Although ostensibly created to represent the interests of the company, in many cases such committees ultimately operate to thwart shareholder efforts to impose accountability on their fellow directors. *Id.* Plaintiffs' counsel were concerned that the SLC would seek to undermine this litigation and prevent Plaintiffs from securing the greatest possible outcome for FirstEnergy and its public shareholders. *Id.* Accordingly, on August 10, 2021, Plaintiffs opposed the requested stay, arguing that the belated formation of the SLC and its requests for a stay were a mere artifice to achieve delay and avoid discovery. ECF No. 127.

On October 21, 2021 this Court agreed with Plaintiffs and denied the SLC's motion for a stay. ECF No. 142. The Court noted that "FirstEnergy delayed setting up the SLC; it has received lengthy stays already; and discovery is active in parallel cases" and held that "this case cannot lie dormant." ECF No. 142 at 9. The Northern District of Ohio likewise denied the SLC's motion to stay that action. NDA ECF No. 117, reported at *Miller*, 2021 WL 4220708, at *1.

The SLC then initiated a flurry of appeals and mandamus petitions seeking to overturn this Court's and the Northern District's denials of the SLC's stay motions. *Emps. Ret. Sys. of St. Louis, et al v. Charles Jones, et al*, Docket No. 21-03993 (6th Cir.) ("Southern District Appeal") App. Dkt. Doc # 1. *Miller v. Anderson et al.*, No. 21-3854 (6th Cir.) ("Northern District Appeal"), Doc.

# 1.  Plaintiffs swiftly moved to dismiss the appeals for lack of jurisdiction and opposed the mandamus petitions as improper under United States Supreme Court and Sixth Circuit precedent. Southern District Appeal, No. 21-03993, Doc # 5-1.  Northern District Appeal, No. 21-3854, Doc #3-1.  The Court of Appeals agreed.  On December 16, 2021, the Court of Appeals denied the SLC's appeals, refused to issue a writ of mandamus, and rejected the SLC's attempts to stay this action—conclusively resolving that discovery in the federal Derivative Actions would proceed unimpeded.  *Emps. Ret. Sys. of City of St. Louis v. Jones*, Nos. 21-3993/4041, 2021 WL 6067034 (6th Cir. Dec. 16, 2021).

### D.    Plaintiffs Take Extensive, Contested Discovery

Shortly after this Court issued its MTD Opinion, Plaintiffs served document requests on FirstEnergy and all Defendants.  Responses were served on June 28, 2021.  The parties thereafter engaged in negotiations concerning the scope of appropriate discovery, but those negotiations were short lived: after the SLC filed its motions to stay on July 20, 2021, FirstEnergy and all Defendants refused to engage in any discovery until the SLC's stay motions were resolved.  Joint Decl., ¶36. Plaintiffs, however, continued to press for discovery.  On August 18, 2021, following protracted negotiations including coordination with the plaintiffs in the parallel securities litigation for purposes of ensuring orderly and efficient progression of this litigation, the parties entered into a stipulated protective order to govern the production of confidential information.  Joint Decl., ¶35. On October 5, 2021, Plaintiffs requested a status conference with Magistrate Judge Jolson seeking an order compelling FirstEnergy and Defendants to comply with their discovery obligations and to produce all documents previously produced to the DOJ.  Also on October 5, after intense negotiations, the parties entered into a Joint Protocol for Production of Documents and Electronically Stored Information.  ECF No. 137.

On October 7, 2021, and October 27, 2021 (ECF Nos. 138, 144), Judge Jolson held status conferences among the parties and ordered Defendants to engage in discovery notwithstanding the pendency of the SLC's investigation. Judge Jolson's assistance resulted in FirstEnergy's production of nearly 300,000 pages of documents, in three tranches between November 5 and 19, 2021, including all documents previously produced to the DOJ as well as to the SEC. Joint Decl., ¶37.

Over the ensuing months, Plaintiffs continued engaging in significant additional document and written discovery seeking evidence beyond that previously produced to the DOJ and SEC to further bolster the record in support of Plaintiffs' claims. Ultimately, Plaintiffs served ten sets of discovery requests, including five sets of Requests for Production, two sets of Interrogatories and three sets of Requests for Admission on FirstEnergy and the Individual Defendants. Joint Decl., ¶40. Plaintiffs received and reviewed thirty-two sets of Responses and Objections to their discovery requests from FirstEnergy and the Individual Defendants. *Id.*

Plaintiffs engaged in complex negotiations with eighteen separate defendants, and nominal defendant FirstEnergy, represented by eight sets of counsel. Plaintiffs ultimately obtained over 500,000 pages of documents, including (i) over 7,000 text messages between and among Defendants and key relevant parties; (ii) over 32,000 emails between and among Defendants and/or key relevant third parties; (iii) full sets of FirstEnergy Board and Committee meeting minutes and materials for a full five-year period; (iv) all of the documents referenced in the Company's July 20, 2021 DPA with the DOJ; and (v) all of the documents previously produced to the DOJ and SEC. Joint Decl., ¶45. Plaintiffs further subpoenaed eleven third parties, including: (i) FirstEnergy's auditors, PricewaterhouseCoopers ("PwC") and Clearsulting LLC; (ii) FirstEnergy shareholders whose previous proposals for increased transparency in FirstEnergy's

– 12 –

political and lobbying activities had been rejected by the Board; (iii) multiple non-defendant former members of the FirstEnergy's Board; and (iv) Defendant Jones' cellular service provider, Verizon. *Id.*

Plaintiffs secured these materials only by aggressively fighting for months to achieve the widest possible breadth of discovery. For example, FirstEnergy and the Defendants initially refused to produce documents dated before January 1, 2017 or after Householder's arrest in July 2020. Through persistent efforts, however, Plaintiffs ultimately obtained FirstEnergy's and all Defendants' agreement to include in their productions all relevant information dated or created over a span of more than five years, commencing January 1, 2016 and extending until at least mid-June 2021. Following contentious negotiations, Plaintiffs also successfully convinced FirstEnergy to produce all Board and Board committee meeting minutes and materials, without any culling for responsiveness, for that entire five-year period and through to the present. As to other categories of documents, Plaintiffs secured FirstEnergy's agreement to search its custodial electronically stored information ("ESI") using approximately 200 search terms and the Defendants' agreement to search their custodial ESI using approximately 260 search terms. Plaintiffs further incessantly fought for and secured the Company's and Defendants' agreement to review and produce relevant text messages exchanged between each Defendant and 30 counterparties, without the application of search terms. Additionally, Plaintiffs secured FirstEnergy's agreement to produce flight logs for the years 2016–2021, without the application of search terms or culling, as well as any phone logs for Defendants within FirstEnergy's possession, custody, or control. Through these efforts, Plaintiffs developed a comprehensive understanding of the events giving rise to this action and of the strengths and weaknesses of their litigation position. Joint Decl., ¶52. The documents obtained

– 13 –

in discovery were absolutely critical in allowing Plaintiffs to successfully negotiate with Defendants to obtain a Settlement of the magnitude achieved.

### E. The Settlement Negotiations

Plaintiffs were committed to take this case to trial from the day they filed their initial complaints. This mindset informed every strategic decision, including the decision to oppose the SLC's motion for a stay and the SLC's appeals and mandamus petitions to the Sixth Circuit.

Plaintiffs understood, however, that insurance would provide the sole or primary source of any financial recovery on the scale of the damages alleged and was a "wasting asset" that would be eroded by further litigation and might be subject to competing claims for different actions. Joint Decl., ¶52. Plaintiffs' counsel also believed that the end of document discovery and beginning of depositions constituted a natural time to explore a potential settlement. *Id.* At that time, all parties would have an informed basis to understand the strengths and weaknesses of their respective positions, and Plaintiffs would be able to maximize leverage provided by the documentary record to obtain historic governance reforms and meaningful compensation for FirstEnergy *before* the commencement of extensive deposition discovery began to dramatically erode the Defendants' available insurance. *Id.* Accordingly, while the majority of Plaintiffs' counsels' litigation team focused on pursuing and reviewing discovery in preparation for imminent depositions and an ultimate trial, Co-Lead Counsel agreed with Defendants and the SLC to conduct a mediation with an experienced mediator, the Honorable Layn R. Phillips (Ret.), in order to explore whether a mutually agreeable resolution could potentially be reached. Joint Decl., ¶51.

From the outset, Plaintiffs demanded ***both*** historic governance reforms designed by their governance expert, Professor Gordon, ***and*** meaningful financial compensation for FirstEnergy, making clear that any other type of settlement would not be acceptable. Joint Decl., ¶53. Plaintiffs also ensured that all plaintiffs in the other pending Derivative Actions would participate in the

– 14 –

mediation and settlement negotiations under the leadership of Co-Lead Counsel in this action. *Id.* This ensured there would be no hold outs to a settlement that would provide meaningful relief for FirstEnergy. *Id.*

Between January 14, 2022 and January 24, 2022, the parties exchanged detailed mediation statements. Joint Decl., ¶56. FirstEnergy's insurance carriers also made a submission. *Id.*. And on February 1, 2022, the parties and the carriers participated in a 13-hour mediation before Judge Phillips. *Id.* In addition to meetings with Judge Phillips, Plaintiffs' counsel also spoke directly with the SLC's counsel and a member of the SLC to make clear Plaintiffs' determination, goals, and objectives. *Id.*

At the end of the February 1 mediation, the parties had not reached a settlement. Plaintiffs' counsel believed, however, that the parties had made sufficient progress to merit the continuation of settlement negotiations. Joint Decl., ¶57. Over the next several days (and nights), the parties continued intense and highly contentious arm's-length negotiations facilitated by Judge Phillips and his team. *Id.*

On February 9, 2022, the parties reached an agreement in principle on the material terms for a resolution of all the Derivative Actions and executed a term sheet (the "Term Sheet"). Joint Decl., ¶58. As part of the Term Sheet, the parties agreed to present the Settlement to this Court, where the vast majority of the related Derivative Actions had been filed and where Plaintiffs and their counsel, who led the settlement negotiations, had filed their complaints and been appointed to leadership by the Court. *Id.* On February 10, 2022, FirstEnergy issued a press release entitled "FirstEnergy Agrees on Terms to Resolve Shareholder Derivative Litigation," informing its shareholders of the principal terms of the Settlement, and stating in part:

The settlement, which is subject to court approval, will fully resolve the derivative actions and stipulates a series of corporate governance enhancements, including:

- Six members of the Board of Directors who have served on the Board for a minimum of five years will not stand for re-election at the company's 2022 annual shareholder meeting.
- A special committee will be formed at the direction of the Board of at least three recently appointed independent directors to initiate a review process of the current executive team, to begin within 30 days of the 2022 annual shareholder meeting.
- The Board will oversee the company's lobbying and political activities, including periodically reviewing and approving political and lobbying action plans prepared by management.
- The Board will form a committee of recently appointed independent directors to oversee the implementation and third-party audits of the Board-approved action plans.
- The company will implement enhanced disclosure to shareholders of political and lobbying activities.
- The company will further align financial incentives of senior executives with proactive compliance with legal and ethical obligations.

The settlement also includes a payment to FirstEnergy of $180 million, to be paid by insurance after court approval, less any court-ordered attorney's fees awarded to plaintiffs.

Joint Decl., ¶58.  Contemporaneously, FirstEnergy also filed the press release on a Form 8-K with the SEC, ensuring that FirstEnergy's shareholders immediately received notice of the proposed Settlement.  Joint Decl., ¶59.

The parties used the Term Sheet as a basis to negotiate the terms of the final Settlement Stipulation, which was executed and submitted to the Court on March 11, 2022.  ECF No. 170-3.

### F.       Preliminary Approval, Notice, and Implementation

On March 11, 2022, Plaintiffs filed a motion seeking preliminary settlement approval which, among other things, sought approval of the proposed notice of settlement to FirstEnergy's shareholders.  ECF No. 170.  On May 9, 2022, the Court granted preliminary approval of the Settlement and the proposed notice.  ECF No. 176 (the "Preliminary Approval Order").  In accordance with the Preliminary Approval Order, FirstEnergy provided notice of the Settlement to shareholders on May 16, 2022.

– 16 –

On May 17, 2022, FirstEnergy held its annual meeting of shareholders. Pursuant to the Settlement, six legacy directors who served on the Company's Board during the bribery scheme did not stand for reelection. As a result, FirstEnergy's twelve-member Board now includes a supermajority of eight directors who joined the Board after the bribery scheme and the Board's issuance of false proxies. Joint Decl., ¶64. Shortly thereafter, pursuant to the Settlement, the newly reconstituted Board formed a Special Review Committee to review the company's C-Suite executives. *Id.*; *see also* FirstEnergy Corp., Form 8-K (June 17, 2022), Ex. 24. This review is ongoing. Joint Decl., ¶64.

If the Settlement is approved, FirstEnergy will also implement additional governance reforms ensuring that the Board takes ownership of political and lobbying activities. Defendants' insurance carriers have deposited $180 million in escrow for payment to FirstEnergy and any Fee and Expense Award approved by the Court.

All Plaintiffs in all related Derivative Actions, the SLC, and Defendants support the Settlement. Joint Decl., ¶65. Since FirstEnergy's February 10, 2022 press release filed with the SEC and the formal notice provided on May 16, 2022, Plaintiffs' counsel have not heard from a single FirstEnergy shareholder objecting to the terms of the Settlement in response to the provided Notice. *Id.*

### G.     Subsequent Parallel Proceedings in the Northern District and State Court Actions

As noted, the parties agreed in their Term Sheet to present the Settlement to this Court, where the vast majority of the related Derivative Actions had been filed and where Plaintiffs and their counsel, who led the settlement negotiations, had filed their complaints and been appointed to leadership roles by the Court. Accordingly, on February 10, 2022, all parties to all three Derivative Actions filed joint motions to stay the Actions pending Settlement proceedings in this

Court.  This Court and the Court of Common Pleas granted the requested stay.  See ECF No. 167; *Genrich v. Anderson et al.*, C.A. No. CV-2020-07-2107, February 21, 2022 Order Granting Joint Motion to Dismiss.  The Northern District did not.  Instead, on February 11, 2022, the Northern District issued an Order and Decision that denied the requested stay without prejudice, expressed the Northern District's view that Plaintiffs had taken insufficient discovery before entering into the Proposed Settlement, requested 11 categories of information concerning the proposed Settlement, and set a hearing to be held on March 9, 2022.  NDA ECF No. 274.

At the March 9, 2022 hearing, following the parties' submission of the requested information, the Northern District reiterated its previously-expressed view that the Derivative Actions should not have settled and that the parties were engaged in a species of "forum shopping" by submitting their Settlement to this Court rather than the Northern District.  NDA ECF No. 280, March 9, 2022 Hr'g Tr. at 20:12–13, 19:6–10.  During the hearing, the Northern District also observed the likely presence of the media and repeatedly pressed Plaintiffs' counsel under threat of possible sanctions to publicly answer numerous questions concerning the Settlement and the underlying confidential discovery record for the apparent purpose of achieving a form of public "accountability" for the Defendants.  At the same hearing, the Northern District also actively (but, to-date, unsuccessfully) solicited third-parties to intervene in the litigation for purposes of upsetting the Settlement.  *Id.* at 37:21-22, 34:21-25; 35:24-36:5; 30:24-31:10.[5]

---

[5]  The Northern District also read into the record a communication the court said it had received from a "shareholder" critical of the Settlement.  NDA ECF No. 280.  Several days later, the court filed a portion of communication on the docket; the communication did not say that the sender was a "shareholder," and the Court did not explain how it knew the sender was a shareholder.  Notably, the communication included factual inaccuracies, including wrongly asserting  Ernst & Young was FirstEnergy's independent auditor during the relevant period.  *See* NDA ECF No. 287.

– 18 –

Following the March 9, 2022 hearing, the Northern District has issued a series of orders further reflecting its displeasure with the Settlement of this litigation and the parties' decision to submit the Settlement in this Court rather than in the Northern District.  Among other things, the Northern District issued an order requiring Plaintiffs' counsel to publicly disclose the identities of the Defendants identified pseudonymously in FirstEnergy's DPA with the DOJ as having paid the bribes giving rise to this action, with which Plaintiffs' counsel complied.  NDA ECF Nos. 290, 291.  The Northern District has refused to stay the Northern District Action, has suggested that it is considering appointing new counsel in the Northern District Action, and has denied a joint motion of all parties to dismiss the Northern District Action without prejudice pending the outcome of the Settlement proceedings in this Court.  NDA ECF Nos. 292, 316, 331.

Plaintiffs disagree with the Northern District's expressed view that this action should not have settled.  As explained herein, Plaintiffs' believe that settling at the present juncture allowed for a greater result for FirstEnergy than could have been achieved by pressing further litigation— both because the immediate governance reforms achieved by the Settlement were only available through a negotiated resolution and because further litigation would have risked substantial erosion of Defendants' insurance policies.  Joint Decl., ¶69.  Plaintiffs also disagree with the Northern District's view that this Court is an inappropriate venue for Settlement proceedings or that Plaintiffs have engaged in any species of forum shopping.  *Id.*  The Settlement is properly before this Court.

## III.    SETTLEMENT TERMS

### A.    Summary of the Terms of Settlement

As Plaintiffs outlined in their preliminary approval brief, the Settlement contains two components.  *First*, Defendants' insurers will pay $180 million to FirstEnergy, less any Court-approved award of attorneys' fees and expenses, which constitutes one of the largest shareholder

derivative recoveries in history and by far the largest in the history of the Sixth Circuit, recovers a substantial majority of the principal government penalty incurred by FirstEnergy and likely damages, captures a substantial majority of Defendants' available insurance, and is likely a greater recovery than that which Plaintiffs could reasonably have expected to recover following a favorable judgment.  Ex. 3, Settlement Stipulation, ¶2(a).

*Second*, FirstEnergy will adopt the significant corporate governance reforms identified in Exhibit A to the parties' Settlement Stipulation and detailed further in Section III.B below.  *Id.* at ¶2(b).  In exchange for this consideration, the Settlement provides that all plaintiffs in all of the pending related Derivative Actions will provide a customary global release, on behalf of the Company, of all derivative claims arising from facts alleged in any of the Derivative Actions. Notably, the Proposed Settlement does not release the Company's existing claims for recoupment of certain compensation from three executives who were terminated by the Company in the wake of the scandal and are Defendants in the Derivative Actions: Jones, Dowling, and Chack.  *Id.* at ¶1(z).  Nor does the Proposed Settlement release any direct claims or other non-derivative claims against the Company or any third parties arising in any way from the bribery scheme (including those direct claims being prosecuted in the related action before this Court captioned *In re FirstEnergy Corp. Sec. Litig.*, Case No. 20-cv-03785 (S.D. Ohio)).

### B.  The Specific Governance Reforms Secured By the Settlement

The governance reforms secured by the Settlement cover five broad areas of remediation, each designed to address specific failures at FirstEnergy that led to the bribery scandal and criminal action against the Company giving rise to this litigation (the "Reforms").  Broadly, the Reforms are designed to create a new culture of independence, oversight, and transparency at FirstEnergy by: (i) creating a new and more independent Board, by requiring that six Defendant directors who served during the pendency of the bribery scheme leave the Board; (ii) requiring an independent

Board-level review of the performance of the Company's current C-Suite executives, including their potential involvement in the bribery scheme; (iii) requiring the Board, through a variety of institutional reforms, to assume active responsibility for, and direct oversight of, the Company's political spending, lobbying and political activities; (iv) requiring enhanced public disclosure to stockholders concerning lobbying, political contributions, and political activities; and (v) creating a newly constituted Compensation Committee of independent directors tasked with establishing appropriate compensation metrics for senior executives tied to each corporate officer's legal and ethical compliance, including a clawback policy to disgorge executives' compensation in the event of their participation in future misconduct.  Ex. 4, Gordon Decl., ¶16.  As described by Professor Gordon, "The Reforms will significantly improve shareholder welfare at FirstEnergy, enterprise value, and also help establish an improved template for Board responsibility-taking and accountability-enabling in the challenging area of the Company's political activity."  Gordon Decl. ¶27.  Significantly, the Reforms go far beyond even what the government was able to achieve through the DPA.  Each of the Reforms secured by the Settlement is detailed further below.

### 1. The Departures of Six Defendant Directors and the Creation of a Newly Independent and Refreshed Board for FirstEnergy

The first, and likely most significant, Reform secured by the Settlement is a complete overhaul of the composition of FirstEnergy's Board.  At the time Plaintiffs filed this Action, and throughout the litigation prior to the Settlement, the Company's Board was dominated by a majority of directors who served during the pendency of the bribery scheme, participated in the issuance of false and misleading annual proxy statements, and are Defendants in this action.  Plaintiffs believed that this state of affairs was untenable and that a significant change in the composition of the Board and its culture was necessary as part of any Settlement.  Joint Decl., ¶79. The Settlement achieves that aim.  It required six Director Defendants to not stand for reelection

in 2022. Specifically, Defendants Anderson (member of the Board since 2007), Johnson (member of the Board since 2011), Misheff (member of the Board since 2012), Mitchell (member of the Board since 2016), Pappas (member of the Board since 2011), and Reyes (member of the Board since 2013) left the Board following the Company's annual shareholder meeting held on May 17, 2022. *Id.* As a result, FirstEnergy is now governed by a twelve-member Board controlled by a supermajority of independent directors who joined the Board *after* the revelation of the bribery scheme giving rise to this litigation.

This transformation of FirstEnergy's Board is significant for numerous reasons. First, it rids the Company of legacy Board members who served during the pendency of the bribery scheme and, Plaintiffs allege, breached their fiduciary duties to shareholders, thus demonstrating a level of accountability to shareholders. Second, it creates a new paradigm between the Board and management for establishing an appropriate "tone at the top" along with new procedures, responsibilities and strategies related to the Company's political spending and lobbying activities—*i.e.*, management is now fully aware that the Company is under the control of a new Board attuned to ensuring compliance. Third, it permits new Board members to review FirstEnergy's current C-Suite executives' potential roles in the bribery scheme, untethered by any prior relationships or biases. Fourth, it restores investor, regulator and public confidence that FirstEnergy is being led by a Board with a supermajority not culpable in connection with the bribery scheme. *See* Gordon Decl., ¶16, 19-24. Plaintiffs believe that the departure of six directors at FirstEnergy, which fundamentally changed the Board, is unprecedented for a large public corporation in the context of a derivative settlement. Joint Decl., ¶79. As Professor Gordon states in his declaration: "it is quite unusual, even extraordinary, to see such a wholesale turnover of the Board as part of the settlement of derivative litigation...But board refreshment was not a condition

– 22 –

for the DPA settlement with the Justice Department in this case.  Rather, the board turnover here directly followed from the derivative ligation." Gordon Decl., ¶ 19.  This Reform demonstrates that "directors can be held accountable for compliance oversight failures" while serving as a powerful deterrent against future misconduct.  *Id*.

### 2. The New Board's Review of FirstEnergy's Senior Executive Team

The second Reform secured by the Settlement requires FirstEnergy's newly-independent Board to implement a process to review FirstEnergy's current C-Suite executives within 120 days of the Company's May 2022 annual meeting.  The Settlement terms require this review to be conducted by a special committee to be comprised of at least three independent Board members who joined the Board on or after 2019.  Plaintiffs obtained this Reform to allow the newly constituted Board to investigate FirstEnergy's current senior officers regarding their role, if any, in the bribery scandal and to take any necessary action.[6]  Based on discovery obtained in this litigation, Plaintiffs believe that a further review of the Company's C-Suite executives is warranted, notwithstanding that a number of executives involved in the scheme have previously been fired from their positions with the Company.  Simply put, cleansing the management ranks of any remaining culpable officers will serve to restore trust in FirstEnergy's Board and management team and allow the Company to move forward with a clean slate.  Indeed, "immediate and possible future changes in personnel will distance the Company from the corporate culture that produced the Violations, serve as a deterrent to potential backsliding, and deliver a potent

---

[6] The new Board formed the Special Review Committee on June 15, 2022, consisting of Ms. Lisa Winston Hicks and Messrs. Paul Kaleta, Sean Klimczak, Jesse A. Lynn, Andrew Teno, and Melvin Williams.  The Special Review Committee expects to make recommendations to the full Board by mid-September.

public signal of the Company's determination to restore its reputation with its shareholders and its regulators."  Gordon Decl. ¶ 20.

### 3. The New Board's Commitment to Oversee FirstEnergy's Political and Lobbying Activities and be Held Accountable in Connection Therewith

The third Reform recognizes that lobbying and political activities are part of any regulated utility and, if undertaken lawfully, are in the best interest of the Company and its shareholders.  In that context, the Board must assume full "responsibility for actively overseeing FirstEnergy's lobbying, political contributions, and political activities as a critical aspect of FirstEnergy's business" to ensure that all such activities remain fully aboveboard.  Settlement Stipulation, Ex. A, #3.  Thus, authority and oversight on these matters will rest with the Board.  *See* Gordon Decl., ¶¶ 16(iii), 21.  This Reform is not merely a guideline for Board oversight but is supported by detailed commitments and activities to be undertaken by the Board.

The specifics of this Reform map out a series of mandated actions the Board must implement, including:

- Requiring management to prepare, for the Board's approval, a Political and Lobbying Action Plan (the "Action Plan");

- Requiring the Company to amend FirstEnergy's Code of Regulations to acknowledge the Board's responsibility in the areas of lobbying, political contributions, and political activities;

- Reconstituting the Corporate Governance and Corporate Responsibility Committee within ten days of the May 2022 annual meeting to consist of a majority of independent directors who joined the Board in 2019 or later;

- Amending the Corporate Governance and Corporate Responsibility Committee's Charter to reflect the specific responsibilities and reporting obligations of the committee, the Board and certain officers, and a provision for engaging a third-party auditor to review the Action Plan annually.  *Id.*

These changes benefit FirstEnergy in multiple ways.  As Board endorsed measures, mandated by charter provisions and reporting mechanisms, the "tone at the top" has changed such

– 24 –

that management (and the Board) will be held to account regarding the Company's political activities. And those activities will be further scrutinized on an annual basis by a third-party auditor. Plaintiffs believed it was critically important to change the "tone at the top" and make the Board and management accountable. Gordon Decl., ¶ 16(iii), 21. Stockholders, regulators, and the public can now gain some comfort knowing that political activities and lobbying efforts will be closely scrutinized.

### 4. FirstEnergy's Commitment to Enhanced Public Disclosures Concerning the Company's Lobbying and Political Activities

The fourth Reform obligates the Board to provide new information in FirstEnergy's annual proxy statements, enhancing transparency to shareholders. The enhanced disclosures are specifically targeted towards ensuring accountability for any future misconduct similar to that reflected in the bribery scheme. First, the annual proxy statements must include a section titled "Transparency in Corporate Contributions" which will reflect certain payments made to political organizations or public officials, directly or indirectly. Settlement Stipulation, Ex. A #4. Second, the proxy statement must also include a third-party audit report disclosing violations or non-compliance with the law or the Action Plan. *Id.*

This Reform establishes an obligation for FirstEnergy to fully report on political activities, and in particular spending and violations of the law. The Reform provides shareholders (and other interested parties) with greater transparency and knowledge that the Company's political activities and spending will be closely monitored. Gordon Decl., ¶¶ 16(iv), 22. Further, this Reform interacts with the third Reform and "the Board's explicit undertaking . . . to approve and oversee implementation of" the Action Plan. Gordon Decl., ¶ 23. This Reform should, moreover, provide greater comfort that the events related to the bribery scandal will not be repeated.

**5. FirstEnergy's Alignment of Senior Executives' Financial Incentives with Proactive Compliance with Legal and Ethical Obligations**

The fifth Reform addresses compensation incentives and clawback issues as they relate to the legal and ethical obligations of senior executives. This Reform requires the Company to reconstitute the Board's Compensation Committee with directors who joined the Board in 2019 or later and to review and implement changes to the Company's compensation practices and clawback policy. The Reform is designed to align incentives of senior executives with their compliance with legal and ethical obligations. It is further designed to implement certain policies with respect to clawbacks, and to authorize the Compensation Committee to review alleged misconduct for the purpose of determining whether a clawback is warranted. Settlement Stipulation, Ex. A #5. This Reform is important to FirstEnergy in two respects. First, the alignment of incentives for legal and ethical behavior, coupled with the ability to clawback compensation from senior executives who engage in misconduct, will serve as a deterrent to illegal conduct. Gordon Decl. ¶ 24. Second, the ability to clawback compensation will permit the Company to recover an offending executive's ill-gotten gains for the Company in the event of future misconduct.

*　　　*　　　*

The Reforms "entail not only a makeover of the Board and further review of C-Suite executives, but many innovations in the Board's role in shaping and overseeing the Company's political and lobbying activities beneficial to the Company and shareholders." Gordon Decl. ¶ 27. The Reforms will remain binding on FirstEnergy for no less than five years after final approval of

the Settlement.[7]  This ensures that FirstEnergy will benefit from the Board's active oversight of, and enhanced disclosures concerning, FirstEnergy's lobbying, political contributions, and political activities for at least five years.  Moreover, these Reforms will become ingrained in FirstEnergy's governance practices and FirstEnergy may retain these practices indefinitely.

## IV.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

### A.     The Legal Standards Governing Final Approval

Pursuant to Federal Rule of Civil Procedure 23.1(c), "[a] derivative action may be settled . . . only with the court's approval."  The Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1."  *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–6 (6th Cir. 1992)).  The Sixth Circuit has recognized, however, that "settlements are welcome" in shareholder derivative actions and that, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with."  *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992).

In evaluating derivative action settlements, courts have borrowed from the law governing class actions under Rule 23.  *See* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1839 (3d ed. 2014).  The pertinent inquiry is whether the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  *See also City of Plantation Police Officers' Emps. Ret. Sys. v. Jeffries*, 2014 WL 7404000, at *5 (S.D. Ohio Dec. 30, 2014).  In making this determination, courts consider seven factors: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in

---

[7] In the event of an acquisition of the Company during the five-year period, the corporate governance reforms will remain in effect for at least twenty-four months after the Company's acquisition.

by the parties; (4) the likelihood of success on the merits; (5) the opinions of representative counsel and the representative parties; (6) the reaction of absent class members (or, in a derivative suit, other shareholders); and (7) the public interest. *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 244 (6th Cir. 2011). In the derivative context, the "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Jeffries*, 2014 WL 7404000, at *5. Courts weigh the "give" and the "get" obtained in a derivative settlement to "determine whether the settlement falls within a range of results that a reasonable party in the position of the plaintiff, not under any compulsion to settle and with the benefit of the information then available, reasonably could accept." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1064 (Del. Ch. 2015).

Here, each relevant factor weighs in favor of final approval.

### B.    The Substantial Benefits for FirstEnergy Achieved by the Settlement Favor Approval

As detailed above, the Settlement creates immense benefits for FirstEnergy. It achieves a complete and revolutionary overhaul of FirstEnergy's Board—taking ultimate control over the affairs of the Company out of the hands of the Defendants and putting control into the hands of new independent directors. Indeed, when this suit was filed and throughout the course of the litigation, FirstEnergy's Board remained dominated by Defendants implicated in the bribery scheme giving rise to this action. As a result of the Settlement, the Board is now controlled by a supermajority of independent directors who joined the Board *after* the revelation of the scheme. This alone represents an extraordinary corporate benefit. But, as detailed above, the Settlement does more. It also ensures that FirstEnergy's newly refreshed and reformed Board will conduct a thorough and independent review of the Company's most senior executives and implements numerous reforms to FirstEnergy's political spending and lobbying practices and relevant

– 28 –

disclosure policies which will create significant, extensive, and long-lasting value for FirstEnergy and its public shareholders.  As Professor Gordon explains in his declaration:

> the Reforms entail not only a makeover of the Board and further review of C-suite executives, but many innovations in the Board's role in shaping and overseeing the Company's political and lobbying activities beneficial to the Company and shareholders.  Accordingly, the Reforms should deliver significant assurance to FirstEnergy shareholders and regulators against a recurrence of the conduct that led to a criminal investigation, a Deferred Prosecution Agreement, the payment of a $230 million fine, liability in numerous civil suits and class actions, and the significant and material loss in shareholder value when the federal indictment was announced.  In that way the Reforms will significantly improve shareholder welfare at FirstEnergy, enhance enterprise value, and also help to establish an improved template for Board responsibility-taking and accountability-enabling in the challenging area of the Company's political activity.

Gordon Decl., ¶ 27.  Numerous courts in this Circuit and around the country have recognized that corporate governance reforms—even those far less significant than those achieved here—are valuable and support approval of shareholder derivative action settlements.[8]  Significantly, such reforms constitute "a form of relief that [Plaintiffs] could not have obtained at trial" and that was therefore only achievable through a negotiated resolution.  *Activision*, 124 A.3d at 1067 (commenting favorably on non-monetary aspects of a shareholder derivative settlement).

---

[8] *See, e.g.*, *Granada Invs.*, 962 F.2d at 1205 (describing "governance changes" aimed at addressing the misconduct at issue as "genuinely beneficial").  *See also see also Rudi v. Wexner*, No. 2:20-CV-3068, 2022 WL 1682297, at *1–2, 6 (S.D. Ohio May 16, 2022) ("*L Brands*") (approving settlement consisting solely of corporate governance reforms, recognizing that the reforms "will significantly increase shareholder value"); *In re Big Lots, Inc. S'holder Litig.*, 2018 WL 11356561, at 5 (S.D. Ohio Aug 28, 2018) (approving settlement consisting of $3.5 million monetary recovery and corporate governance reforms, finding that the governance reforms will "be meaningful in preventing any future misconduct.").  *See also In re Alphabet Inc., S'holder Deriv. Litig.*, Lead Case No. 19-CV- 341522, slip op. at 6-9 (Cal. Super. Ct., Santa Clara Cty. Nov. 30, 2020) (Ex. 25) (approving settlement consisting solely of corporate reforms to prevent discrimination and harassment issues giving rise to the litigation); *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011) (approving settlement consisting of corporate governance reforms and a $75 million payment by carriers finding that "the settlement is likely to provide considerable corporate benefits to Pfizer and its shareholders, in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company").

The Settlement, moreover, pairs these substantial benefits with a historic monetary recovery.  Pursuant to the Settlement, Defendants will cause their insurers to pay a full $180 million in cash, less attorneys' fees, to FirstEnergy.  As the Court noted in its Preliminary Approval Order, "[t]he monetary component, at $180 million, measures favorably against other shareholder derivative settlements[.]"  Preliminary Approval Order at 4.[9]  Indeed, if approved, it would represent the largest monetary recovery in any shareholder derivative action in the history of the Sixth Circuit by a wide margin[10] and one of the largest shareholder derivative recoveries ever achieved in any forum in the history of the United States.[11]

The $180 million monetary recovery also compares favorably with the potential damages in this case.  Although it is not possible to determine the total damages incurred by FirstEnergy with precision, the monetary component of the Settlement represents an impressively high percentage of damages when compared to other derivative actions and securities class actions.

---

[9] Notably, shareholder derivative settlements historically have only rarely resulted in any type of monetary recovery.  *See, e.g.*, Jessica Erickson, *Corporate Governance in the Courtroom: An Empirical Analysis*, 51 WM. & MARY L. REV. 1749 at 1754, 1799 (2010) (detailing a comprehensive twelve-month study of federal court derivative suits and finding "[r]emarkably few of the suits in my study ended with the corporation receiving a meaningful financial benefit," with "*[o]nly 1 of the 101 suits that I have termed classic derivative suits [resulting in] a cash payment to the plaintiff corporation*.") (emphasis added).

[10] *See In re Community Health Sys., Inc. S'holder Deriv.* Litig., No. 11-cv-00489 (M.D. Tenn. Jan. 17, 2017) (Transcript at 11) (approving settlement comprised of $60 million payment and reforms, described as "the biggest derivative settlement in the Sixth Circuit") (Ex. 10).  On May 25, 2022, the parties to the *Cardinal Health* derivative suit pending in this District submitted a settlement including a monetary recovery of $124 million (and no governance reforms) for preliminary approval.  *See In re Cardinal Health, Inc. Deriv. Litig.*, No. 2:19-cv-2491 (S.D. Ohio, May 25, 2022), ECF No. 100, Plaintiffs' Unopposed Motion for Preliminary Settlement Approval, at PAGEID #: 3168 (Ex. 27).  Plaintiffs believe that settlement, which remains pending, now stands to represent the second largest derivative recovery in the Sixth Circuit.

[11] *See* Kevin LaCroix , "Largest Derivative Lawsuit Settlements," THE D&O DIARY (updated June 13, 2022) (available at: https://www.dandodiary.com/2014/12/articles/shareholders-derivative-litigation/largest-derivative-lawsuit-settlements/).

Plaintiffs' damages case has centered on the $230 million penalty imposed on FirstEnergy pursuant to the DPA, a full ***78.26%*** of which is recovered by the Settlement.[12]   This recovery compares favorably with other significant settlements of shareholder derivative actions involving unusually large monetary recoveries.  *See, e.g.*, *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 338 (S.D.N.Y. 2011) (granting final approval of derivative settlement with $75 million monetary component, which represented 3.26% of penalties paid to the federal government in connection with the relevant misconduct); *In re Boeing Company Derivative Litigation*, C.A. No. 2019-0907-MTZ, Tr. at 68, 94 (Del. Ch. Feb. 23, 2022) (TRANSCRIPT) (Ex. 28), *Boeing*, No. 2019-0907-MTZ, Verified Amended Consolidated Complaint at ¶294 (Del. Ch. Feb. 5, 2021) (available at: 2021 WL 496766) (granting final approval of derivative settlement with $237.5 million monetary component, representing less than 10% of the principal criminal penalty paid and less than 1.5% of total potential damages); *In re Wells Fargo & Company S'holder Deriv. Litig.*, No. 16-CV-05541-JST, 2019 WL 13020734, at *6 (N.D. Cal. May 14, 2019) (derivative settlement with $240 million monetary component represented 21.8% of out-of-pocket damages and less than 10% of

---

[12] At the time of the Settlement, it was not possible to determine the total damages incurred by FirstEnergy with precision, as much of those damages remained speculative.  For instance, damages associated with the amorphous reputational harm inflicted upon the Company as a result of the bribery scandal are very difficult to quantify. The same is true regarding estimates of the potential liabilities facing FirstEnergy in the related consolidated federal securities class action and consolidated consumer class action, as well as potential liabilities flowing from ongoing regulatory proceedings.  The sources of readily identifiable damages to FirstEnergy included principally the $230 million penalty imposed by the DPA, the approximately $60 million in corporate funds misappropriated for use in the bribery scheme, the more than $100 million in compensation FirstEnergy paid to the Individual Defendants while the scheme was ongoing, and the Company's defense costs incurred in connection with the various related actions and regulatory investigations, which FirstEnergy regularly discloses in its filings with the SEC.  Following the parties' entry into the Term Sheet and Stipulation of Settlement, FirstEnergy reached a $37.5 million settlement in the consumer class action.  *See Buldas v. FirstEnergy Corp., et al*, C.A. No. 2:20-cv-03987, ECF No. 141-1, Settlement Agreement, (S.D. Ohio). FirstEnergy announced that it had taken a $37.5 million reserve in its Form 10-K filed on February 16, 2022, after the parties entered into the Term Sheet.

– 31 –

total potential damages).  The Settlement is also extraordinary in comparison to typical securities class action settlements.  According to one study by NERA Economic Consulting, the median ratio of the settlement amount to investor losses in both 2020 and 2021 was 1.8%.  The same study found that, for securities cases settled from December 2012 through December 2021, the median settlement value as a percentage of investor losses for cases with investor losses ranging from $200 million to $4.999 billion ranged between 2.3% to 1.3%.[13]

The $180 million monetary component of the Settlement, moreover, captures the vast majority of Defendants' available insurance, which Plaintiffs reasonably determined represented the primary source of any recovery on the scale of the damages alleged.  *Cf. Boeing* (Ex. 28)*,* Tr. at 89 ("[I]n view of the scale of Boeing's corporate losses, penalties, fines, and settlements after the two crashes, insurance is the only source of any meaningful recovery.  The defendants are individuals, not entities.  Their insurance policies are the deepest pocket available to Boeing and its stockholders.").  Defendants' relevant policies are "wasting" policies, subject to erosion to pay defense costs and any settlements in other related actions.  Pressing further litigation in lieu of agreeing to the Settlement, therefore, created a serious risk of substantial erosion of the policies, rendering any future judgement on the scale of $180 million unrecoverable and a pyrrhic victory.

Notably, the $180 million recovery achieved here also compares favorably to the recoveries in historically-large precedent cases as a percentage of the Defendants' insurance coverage.  Though it is uncommon for the parties to a derivative settlement to disclose the extent of available insurance, the parties in both *Wells Fargo* and *Boeing* did so.  In *Boeing*, the Defendants possessed $550 million in D&O insurance, meaning the plaintiffs recovered 43.18% of the relevant

---

[13] *See* NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review*, at 23–24 (2022) (available at: https://www.nera.com/publications/ archive/2022/recent-trends-in-securities-class-action-litigation--2021-full-y.html).

policies.[14]  In *Wells Fargo*, the Defendants possessed $500 million in D&O insurance coverage, meaning the plaintiffs recovered 48% of the relevant policies.[15]  Here, Plaintiffs' $180 million recovery represents 78.26% of the $230 total D&O insurance possessed by Defendants (and 81.81% of the approximately $220 million in coverage that remained uneroded at the time of Settlement).[16]

In sum, the Settlement here includes both historic corporate governance reforms and a historic financial recovery—an extraordinary result for FirstEnergy and its public shareholders, weighing heavily in favor of final approval.

### C.    The Parties' Arm's-Length Mediation Process Favors Approval

The Settlement here results from extensive arm's-length negotiations that were contentious, non-collusive, and supervised by an experienced and highly-regarded mediator.  As Judge Phillips explains in his declaration: "The mediation process [leading to the Settlement] was an extremely hard-fought negotiation from beginning to end and was conducted by experienced and able counsel on both sides.  Throughout the mediation process, the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith."  Ex. 5, Phillips Decl. at ¶12.

---

[14] *In re the Boeing Company*, No. 2019-0907-MTZ, Co-Lead Plaintiffs' Reply Brief in Further Support of Settlement, Application for Award of Attorneys' Fees and Expenses, and Incentive Award, at 2–3 (Del. Ch. Jan. 25, 2022); available at: 2022 WL 500852.

[15] *See In re Wells Fargo & Company*, No. 4:16-cv-05551-JST (N.D. Cal. Apr. 2, 2019), ECF No. 272, Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval of Settlement at 1 (Ex. 29).

[16] Defendants' total available D&O insurance was $230 million, which had eroded to $220 million at the time of the Settlement due to defense costs related to the bribery scandal.  Joint Decl., ¶73.  The extent of erosion in *Wells Fargo* and *Boeing* was not disclosed publicly.

Where, as here, a proposed settlement is the result of arm's-length negotiations among experienced counsel, courts generally presume that the settlement is non-collusive.  *See, e.g., Bailey v. AK Steel Corp.*, 2008 WL 495539, at *4 (S.D. Ohio Feb. 21, 2008) ("Courts presume the absence of fraud or collusion, unless there is evidence to the contrary") (quotation marks and citations omitted).  Moreover, as this Court has explained, "[t]he participation of an independent mediator in settlement negotiations *virtually [e]nsures* that the negotiations were conducted at arm's length and without collusion between the parties."  *In re Wendy's Co. S'holder Deriv. Action*, Case No. 16-cv-1153, 2020 WL 13169460, at *7 (S.D. Ohio Jan. 24, 2020).  Judge Phillips is a preeminent mediator and numerous courts throughout the country have acknowledged that his involvement in particular weighs in favor of settlement approval.  *See, e.g.*, *Voulgaris v. Array Biopharma Inc.*, No. 17-cv-02789, 2021 WL 6331178, at *6 (D. Colo. Dec. 3, 2021) ("The arm's-length nature of the parties' negotiations and the active involvement of an independent mediator, such as Judge Phillips in particular, provide strong support for approval of the Settlement.").  Accordingly, this factor weighs in favor of approval.

### D.    The Likely Complexity, Expense, and Duration of Further Litigation Favors Approval

"[A]voiding the delay, risks, and costs of continued litigation against a defendant is a valid reason for counsel to recommend and for the court to approve a settlement." *In re Big Lots, Inc. S'holder Litig.*, 2018 WL 11356561, at *3 (internal quotation marks and citation omitted).  When assessing whether to approve settlements of derivative actions, courts routinely recognize the unique complexity and inherent unpredictability of such actions. *See, e.g., Nat. Ret. Fund v. Watts*, 2005 WL 2877899, at *3 (D.N.J. Oct. 28, 2005) ("Derivative suits are by their nature undeniably complex").  As the Sixth Circuit has noted, derivative actions are "notoriously difficult and unpredictable." *Granada*, 962 F.2d at 1205 (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455

– 34 –

(5th Cir. 1983)); *see also In re Pacific Enters., Sec. Litig.*, 47 F. 3d 373, 378 (9th Cir. 1995) ("[D]erivative lawsuits are rarely successful."). Indeed, shareholder derivative actions feature a host of idiosyncratic procedural and factual hurdles, and their attenuated risks, that are generally absent from other complex litigation.

Here, had Plaintiffs pursued further litigation in lieu of the Settlement, Plaintiffs would have faced significant risks to successfully prosecuting their claims and obtaining meaningful relief for FirstEnergy and its shareholders. Though Plaintiffs successfully overcame Defendants' motions to dismiss, at trial the factfinder would—unlike at the pleading stage—weigh the evidence for and against liability. Notably, to recover damages for alleged breaches of fiduciary duty under Ohio law, Plaintiffs would have been required to meet an extraordinarily high evidentiary standard. Specifically, they would have been required to prove by "clear and convincing evidence" that the directors or officers acted or failed to act with "deliberate intent to cause injury" to FirstEnergy or with "reckless disregard" for FirstEnergy's best interests. Ohio Rev. Code §§ 1701.59(E) and 1701.641(D). Satisfying this standard, particularly as to the Director Defendants, would have presented challenges. It is widely-recognized that fiduciary breach claims premised on oversight failures, even in jurisdictions such as Delaware with standards of proof lower than Ohio's "clear and convincing" evidence standard, are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *See In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959, 967 (Del. Ch. 1996).

Further, at trial certain of the Defendants may have prevailed on their defense that they reasonably relied on reports from management, external auditors, or others, that contained no indication of wrongdoing relating to HB 6 or any of the Company's political activities. The Defendants would argue that they were statutorily entitled to rely on "information, opinions,

reports, or statements" provided by others on whom they reasonably believed they could rely. Ohio Rev. Code §§ 1701.59(C) (as to a company's directors), 1701.641(B) (as to a company's officers). That includes other FirstEnergy directors, officers, and employees, public accountants, and all other persons as to matters reasonably believed to be within the person's professional or expert competence. *Id.* While Plaintiffs' counsel believed they had strong counter-arguments, there would have been many challenges in establishing all of the elements necessary to prove Plaintiffs' claims. Defendants' arguments could have materially reduced the amount of recoverable damages available and adversely affected any potential recovery.

Moreover, even if Plaintiffs successfully demonstrated liability, Plaintiffs would have encountered additional hurdles with respect to demonstrating damages. Specifically, while certain damages (such as the $230 million fine to the DOJ) could be easily ascertained, other damages such as non-pecuniary reputational harm, are amorphous and difficult to quantify. Moreover, some potential damages had not yet been incurred at the time of the Settlement and remain speculative, further complicating the damages-related challenges faced by Plaintiffs.

The significant expense of continued litigation, including dozens of depositions, extensive motion practice, expert discovery, and a lengthy trial posed yet another obstacle. As noted, FirstEnergy's insurance policies, which represented the main source of recoverable assets, would continue to be eroded by legal costs if the Derivative Actions were litigated through a trial (or trials), meaning the ultimate recovery could very well be lower even if Plaintiffs secured a favorable judgment. As a result, the likelihood of drawn-out, expensive litigation which depleted the main source of recoverable assets further supports that the Settlement was in the best interest of FirstEnergy and its stockholders. As this Court has recognized, protracted litigation would be unlikely to produce a better result than that achieved by the Settlement. Preliminary Approval

Order at 4 (noting that "the Company's insurance policies, which are the main source of recoverable assets, are being eroded by legal costs as this derivative action continues, meaning the ultimate recovery might be higher now than at the end of a case tried to verdict."). *See also In re Big Lots, Inc. S'holder Litig.*, 2018 WL 11356561, at *3 (finding that "[a]bsent settlement, continued litigation of this case would likely take more than a year and result in the parties incurring significant expense"); *see also Rudi v. Wexner*, No. 2:20-CV-3068, 2022 WL 1682297, at *3 (S.D. Ohio May 16, 2022) ("*L Brands*") ("There are complex issues of law that would need to be briefed and decided… the parties would have to engage in significant discovery, briefing for summary judgment, and possible trial and appeals. Additionally, the parties are represented by very sophisticated counsel that would undoubtedly vigorously prosecute and defend the claims in this case.  This supports settlement.").

Plaintiffs also faced the risks and expenses inherent in any complex litigation, including, among other things, additional dispositive motion practice such as motions for summary judgment, other pretrial challenges, battles of the experts, a lengthy trial, and post-trial litigation and appeals. As the court recognized in *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *5 (S.D. Ohio Aug. 19, 2009), "[Settlement] secures a substantial benefit . . . in a highly complex action, undiminished by further expenses, and without delay, costs, and uncertainty of protracted litigation."  Given the nature of the claims at issue, moreover, it was also possible that Defendants' insurers could have ultimately denied coverage in connection with a post-trial judgment, giving rise to collateral litigation.  *See In re Galena Biopharma, Inc. Deriv. Litig.*, Case No. 14-cv-00516, 2016 WL 10840600, at *2 (D. Or. June 24, 2016) (noting the individual defendants' "insurers dispute coverage and if the Action does not settle and continues

to be litigated, there is a risk that insurance coverage will be denied and an additional insurance coverage lawsuit may ensue").

The SLC posed yet another risk to Plaintiffs' claims.  At the time that the Parties entered into the Term Sheet and ultimately the Settlement Stipulation, the SLC had not issued any findings or a report.  Given the SLC's prior actions in this case (including fighting to stay this Action, both in this Court and the Sixth Circuit), Plaintiffs faced the real and significant risk that the SLC would seek to take over the action and move to terminate all or some of the claims.  *In re Big Lots, Inc. S'holder Litig.*, 2018 WL 11356561, at *3 (noting that the "likelihood of success for Plaintiffs was far from assured" where a special litigation committee had moved to dismiss Plaintiffs' claims).  Ohio law empowers an SLC to determine whether to pursue or terminate a derivative suit brought on behalf of a corporation, and courts will defer to this judgment where: "(1) the SLC is comprised of independent, disinterested [members]; (2) the SLC conducts its inquiry in good faith; and (3) the committee's recommendation is the product of a thorough investigation."  *Miller v. Bargaheiser*, 70 Ohio App. 3d 702, 709, 591 N.E.2d 1339, 1344 (1990) (upholding trial court's decision to accept the recommendation of the SLC and dismiss derivative suit).  Unlike in Delaware and some other states, Ohio law prohibits courts from making an independent determination of the business's best interests in connection with an SLC dismissal motion.  *Id.* at 1342–43 (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786-87 (Del. 1981)).  The existence of the SLC and the possibility that the SLC could recommend dismissal of some or all of Plaintiffs' claims created yet another potential roadblock for Plaintiffs.

Similarly, Plaintiffs faced potential appellate issues with respect to Plaintiffs' theory of liability for the Director Defendants under Section 14(a) of the Exchange Act.  As this Court recognized when denying Defendants' motions to dismiss, "the Sixth Circuit has yet to define

'transaction causation' for purposes of a Section 14(a) claim under circumstances analogous to those presented here."  MTD Opinion at 30.  Although this Court correctly denied Defendants' motion for interlocutory appeal regarding this issue (ECF No. 151), the lack of clear controlling precedent by the Sixth Circuit created risk and could have resulted in a prolonged appellate process even after a successful trial, which militates further in favor Settlement approval.  *See Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010), *aff'd sub nom., Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235 (6th Cir. 2011) (approving settlement "[g]iven the unsettled nature of the law with respect to certain claims").

Here, in light of the myriad factual and legal issues involved, there is no way to predict how Plaintiffs' claims would have ultimately been resolved.

### E.    The Likelihood of Success on the Merits Favors Final Approval

Though Plaintiffs were confident in the merits of their claims, derivative litigation is "notoriously difficult and unpredictable," *Granada Invs.*, 962 F.2d at 1205, and besides the time-value of money, litigating this Action through trial and possible appeals was not a risk-free proposition.  *Nationwide*, 2009 WL 8747486, at *2 (noting that "in assessing the Settlement, the Court should balance the benefits afforded to [shareholders], and the *immediacy* and *certainty* of a substantial recovery for them, against Plaintiffs' likelihood for success on the merits.").

Though their claims were strong, Plaintiffs faced significant risks, including but not limited to: (i) the difficulty of establishing breach of fiduciary duty claims under Ohio law under the "clear and convincing evidence" standard; (ii) the difficulty of ascertaining and proving certain damages, including non-pecuniary reputational harm and damages that were not yet incurred; (iii) the risk that Defendants' wasting insurance policies would be depleted by the significant cost of depositions, expert discovery, and trials; (iv) the risk that the SLC would recommend dismissal of

some or all of the claims; and (v) the risk of appeal, including on issues with respect to Plaintiffs' theory of liability for the Director Defendants under Section 14(a) of the Exchange Act.

In light of the substantial benefits of the Settlement—which notably include governance benefits that could not have been achieved absent a negotiated resolution—such palpable risks reinforce that the Settlement is well within the range of reasonableness.

### F.    Plaintiffs' Development of an Extensive Discovery Record Favors Approval

In determining whether to approve the Settlement, the Court also considers the amount of discovery in order "[t]o insure that Plaintiff[] ha[s] had access to sufficient information to evaluate [its] case and to assess the adequacy of the proposed Settlement." *Nationwide*, 2009 WL 8747486, at *5. As detailed above and in the Joint Declaration, the Settlement was achieved after 18 months of hard-fought litigation and extensive discovery, including review of over 500,000 pages of documents produced by Defendants and relevant third parties.[17] Joint Decl., ¶45. This included review of all documents produced to the DOJ and the SEC in connection with their investigations, as well as all the documents referenced in the Company's July 20, 2021 DPA with the DOJ. *Id.* This also included the review of thousands of text messages between and among Defendants and key relevant parties. *Id.* Plaintiffs also reviewed dozens of discovery requests and responses, including Defendants' responses to Plaintiffs' Requests for Admissions and Interrogatories. *Id.* Plaintiffs were actively preparing for 22 depositions when the Term Sheet was executed on February 9, 2022. Joint Decl., ¶38. On this record, there can be no doubt that Plaintiffs had access to sufficient information to evaluate the strengths and weaknesses of their claims and make an informed decision as to the adequacy of the Settlement.

---

[17] This significant production was the result of hard-fought negotiations with eighteen different Defendants and FirstEnergy, represented by eight separate sets of counsel.

### G. The Support of Plaintiffs and Their Experienced Counsel Favor Settlement

"Generally, courts will give deference to plaintiffs counsel's determination to settle a case." *Bailey*, 2008 WL 495539, at *4 (quoting *Berry v. School Dist.,* 184 F.R.D. 93, 104 (W.D. Mich. 1998)). Indeed, "when significant discovery has been completed, the Court should defer to the judgment of experienced trial counsel who has evaluated the strength of his case." *Bronson v. Board of Educ.*, 604 F. Supp. 68, 73 (S.D. Ohio 1984) (citing *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983)).[18] Here, Plaintiffs' counsel have extensive experience in complex shareholder litigation, have completed significant discovery, and believe that the Settlement is fair, reasonable, and adequate. Joint Decl., ¶94.

Moreover, Plaintiffs themselves are sophisticated institutional plaintiffs who have experience overseeing complex litigation and working with counsel to achieve significant results for stockholders. Plaintiffs received regular updates from counsel concerning case progress, actively oversaw the litigation and the settlement negotiations, and support the Settlement. *Gascho v. Glob. Fitness Holdings, LLC,* No. 2:11-CV-436, 2014 WL 1350509, at *18 (S.D. Ohio Apr. 4, 2014), *report and recommendation adopted*, No. 2:11-CV-00436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269 (6th Cir. 2016) (noting that, "[n]ot insignificantly, the Class Representatives have also approved the Settlement Agreement."). Notably, the SLC has also agreed that the Settlement secured by Plaintiffs serves the Company's best interests.

---

[18] *See also In re Se. Milk Antitrust Litig.*, No. 2:07-CV-208, 2012 WL 2236692, at *3 (E.D. Tenn. June 15, 2012) ("Obviously, there has been extensive discovery in this case involving experienced trial counsel. Based upon that discovery, plaintiffs' counsel have made a judgment that the settlements are fair, reasonable, and adequate. Accordingly, this Court will give substantial weight to the opinion of plaintiffs' experienced trial counsel, and concur that the settlements are fair, reasonable and adequate."); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (when settlement negotiations are conducted at arms' length, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"); *Hainey v. Parrott*, 617 F. Supp. 2d 668, 675 (S.D. Ohio 2007) (highly experienced litigator's opinion of proposed settlement was "entitled to considerable weight").

### H.  The Reaction of Absent Shareholders Favors Final Approval

The deadline for absent shareholders to object to the proposed settlement has not yet passed.  To date, however, counsel have not heard from any shareholder indicating they are not satisfied with the Settlement.  *See Hainey*, 617 F. Supp. 2d at 675 ("Generally . . . small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate.").  This is particularly noteworthy given the Northern District's public call for shareholders to intervene and prosecute FirstEnergy's claims that are part of the Settlement and FirstEnergy's prompt and repeated notice of the Settlement since February 10, 2022.  This factor will be further addressed in Plaintiffs' reply papers in support of the proposed Settlement, to be filed after the deadline for objections has passed.

### I.  The Public Interest Favors Approval

Finally, "[t]here is a strong public interest in encouraging settlement of complex litigation and class-action suits because . . . settlement conserves judicial resources." *Bailey*, 2008 WL 495539, at *4 (citing *Granada*, 962 F.2d at 1205).  As the Sixth Circuit has recognized, "[s]ettlements are welcome in [derivative] cases such as this because litigation is 'notoriously difficult and unpredictable.'"  *Granada*, 962 F.2d at 1205 (quoting *Maher*, 714 F.2d at 455); *Nationwide*, 2009 WL 8747486, at *8 ("there is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve.").

Moreover, the public interest is served by the terms of the Settlement, which provide for both a very large cash payment and significant corporate governance reforms at a large, prominent public company, upon which thousands of employees and millions of customers depend.  The Settlement's monetary component will fortify FirstEnergy's financial reserves and its governance reforms will help ensure that FirstEnergy remains a stable and law-abiding corporate citizen worthy of the trust placed in it not only by its shareholders, but also by its many employees and

– 42 –

customers. Indeed, Plaintiffs believe the Settlement's governance Reforms may serve as a model for other companies to improve their governance in the sphere of political contributions and lobbying activities. These significant reforms could not have been achieved even if Plaintiffs prevailed at trial on all counts and were only made possible through the negotiated Settlement.

*　　　　*　　　　*

In sum, the Settlement constitutes an exceptional outcome for FirstEnergy fully reflecting the strength of Plaintiffs' claims as weighed against the risks associated with further litigation, follows extensive discovery conducted by experienced counsel, and results from arm's-length negotiations facilitated by an esteemed mediator. It meets all of the standards for approval and should be finally approved.

## V.   THE REQUESTED FEE AND EXPENSE AWARD IS FAIR AND REASONABLE AND SHOULD BE APPROVED

Plaintiffs seek a total Fee and Expense Award for counsel, who have litigated this action since its inception on a completely contingent basis, in the amount of $48.6 million—representing 27% of the $180 million monetary benefit achieved. As detailed herein, Plaintiffs submit that the requested Fee and Expense Award is fully justified by the work performed by counsel in this litigation and the historic benefits achieved as a result thereof.[19]

---

[19] The Fee and Expense Award will compensate counsel for Plaintiffs St. Louis, Local 103, and MLPF, as well as counsel for certain other plaintiffs in the related Derivative Actions who performed work contributing to the Settlement achieved, including counsel for the named plaintiff in the Northern District Action and for the lead plaintiffs in the State Court Action. Court-appointed Co-Lead Counsel from the Saxena White and Bernstein Litowitz firms will be responsible for distributing any Court-approved Fee and Expense Award among the various contributing law firms in a manner equitably reflecting each firm's work performed and substantive contribution to the result achieved.

### A.    The Legal Standard Governing Fee Applications

When assessing the reasonableness of a fee petition, courts in the Sixth Circuit engage in a two-part analysis. *Rikos v. Proctor & Gamble Co*., No. 1:11-CV-226, 2018 WL 2009681, at *8 (S.D. Ohio Apr. 30, 2018) (citing *In re Cardinal Health Inc. Sec. Litig*., 528 F.Supp.2d 752, 760 (S.D. Ohio 2007)). "First, the district court determines the method for calculating fees: either the percentage of the fund approach or the lodestar approach." *Id*. The preferred method is "to award a reasonable percentage of the fund, with reference to the lodestar and the resulting multiplier." *Rikos*, 2018 WL 2009681, at *8 (quoting *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 08-cv-1119, 2011 WL 292008, at *13 (S.D. Ohio Jan. 26, 2011); *see also L Brands*, 2022 WL 1682297, at *4 (analyzing settlement of shareholder derivative action involving L Brands using the percentage of the fund approach); *Big Lots,* 2018 WL 11356561, at *5.

"Second, the court must analyze the six factors set forth by the Sixth Circuit in *Ramey v. Cincinnati Enquirer, Inc*., 508 F.2d 1188, 1196 (6th Cir. 1974)." *Id*. The *Ramey* factors include:

> 1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis, 5) the complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides.

*Ramey*, 508 F.2d at 1196. Each of the *Ramey* factors, discussed below, support the requested Fee and Expense Award.

### B.    The Benefits Achieved by Counsel Support the Requested Fee and Expense Award

The first *Ramey* factor, the value of the benefit rendered, is widely regarded as the most important. *Cardinal Health*, 528 F.Supp.2d 752, 764 (S.D. Ohio 2007). Here, as detailed above, Plaintiffs' counsel secured a Settlement creating immense monetary and non-monetary benefits

– 44 –

for FirstEnergy.  For achieving these benefits, Plaintiffs' counsel seek a total Fee and Expense Award of 27% of the $180 million monetary recovery achieved.

Plaintiffs' counsel's request for 27% of the common fund created is supported by precedents applying the favored "percentage of the fund" approach for determining an appropriate fee award.  *See Moore v. Aerotek, Inc*., No. 2:15-CV-2701, 2017 WL 2838148 at * 6 (S.D. Ohio June 30, 2017), *report and recommendation adopted,* No. 2:15-CV-2701, 2017 WL 3142403 (S.D. Ohio July 25, 2017) (recognizing that, in the Sixth Circuit, "[f]ee awards in common fund cases generally are calculated as a percentage of the fund created, with the percentages awarded typically ranging from 20 to 50 percent of the common fund created.").[20]  Indeed, the plaintiffs' counsel who secured the prior largest derivative settlement in the Sixth Circuit—the $60 million (plus governance) settlement achieved in *Community Health*—were awarded $20 million, or 33.3% of the monetary recovery achieved.  *See In re Community Health Sys., Inc. S'holder Deriv.* Litig., No. 11-cv-00489 (M.D. Tenn. Jan. 17, 2017) (Transcript at 4, 9, 11) (Ex. 26).  Other significant derivative settlements involving large monetary recoveries and meaningful governance reforms have likewise been found to support awards in the range of Plaintiffs' request.[21]  *See Pfizer*, 780

---

[20] *See also Grae v. Corr. Corp. of Am*., No. 3:16-CV-02267, 2021 WL 5234966, at *1 (M.D. Tenn. Nov. 8, 2021, *Grae*, No. 3:16-CV-02267, ECF No. 469 at PAGEID #: 25019 (Ex. 30) (awarding one-third of $56 million settlement); *Worthington v. CDW Corp*., No. 1:03-cv-00649, 2006 WL 8411650, at *6 (S.D. Ohio May 22, 2006) (finding that fee of approximately 38% "is solidly within the typical 20 to 50 percent range"); *Karpik v. Huntington Bancshares Inc.*, No. 2:17-cv-1153, 2021 WL 757123 (S.D. Ohio) (awarding 33.3% fee plus expenses in a class action recovery in an ERISA action).

[21] Notably, in the analogous shareholder class action context, numerous courts in this Circuit and across the country have also awarded attorneys' fees exceeding Plaintiffs' requested Fee and Expense Award in actions involving large settlement funds.  *See Schuh v. HCA Holdings, Inc*., No. 3:11-CV-01033, 2016 WL 10570957, at *1 (M.D. Tenn. Apr. 14, 2016), *Schuh*, No. 3:11-CV-01033 (M.D. Tenn. Mar. 7, 2016), ECF No. 540, Motion for Final Approval, at PAGEID #: 45385 (Ex. 32) (awarding 30% of $215 million settlement); *Peace Officers' Annuity & Benefit Fund of Ga v. Davita, Inc. et. al*., No. 17-CV-0304-WJM-NRN, 2021 WL 2981970, at *4 (D. Colo. July

– 45 –

F. Supp. 2d at 344 (granting award amounting to 29.3% of $75 million monetary recovery in derivative settlement also involving governance reforms); *Cumming v. Edens, et al.*, No. 13007-VCS (Del. Ch. July 31, 2019), Transcript at 10, 13 (Ex. 33) (granting award amounting to 27.4% of $53 million monetary recovery in derivative settlement also involving governance reforms); *City of Monroe Employees' Retirement System v. Murdoch, et al.*, C.A. No. 2017-0833-AGB (Del. Ch. Feb. 9, 2018), Transcript at 30, 49 (Ex. 34) (granting award amounting to 25% of $90 million monetary recovery in derivative suit); *McKesson*, No. 4:17-cv-01850-CW (N.D. Cal. Apr. 22, 2020), ECF No. 222 at 9-10, Order (Ex. 35) (granting award amounting to 25% of $175 million monetary recovery in derivative settlement also involving governance reforms); *Wells Fargo*, 445 F. Supp. 3d at 526 (granting award amounting to 22% of $240 million monetary recovery in derivative settlement also involving governance reforms).[22]

---

15, 2021) (awarding 30% of $135 million settlement); *In re Apollo Grp. Inc. Sec. Litig.*, CV 04-2147-PHX-JAT, 2012 WL 1378677, at *9 (D. Ariz. Apr. 20, 2012) (awarding one-third of $145 million settlement); *City of Pontiac General Emps. Ret. Sys. v. Wal-Mart Stores*, No. 5:12-CV-5162, 2019 WL 1529517, at *1 (W.D. Ark. Apr. 8, 2019) (awarding 30% of $160 million settlement); *In re Genworth Fin. Inc. Sec. Litig.*, No. 3:14-cv-682, 2016 WL 7187290 (E.D. Va. Sep. 26, 2016) (awarding 28% of $219 million settlement); *In re Wilmington Trust Sec. Litig.*, No. 10-cv-0990, 2018 WL 6046452, at *7, 11 (D. Del. Nov. 19, 2018) (awarding 28% of $210 million settlement); *In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, No. 08-cv-2177, 2013 WL 5505744, *57 (D.N.J. Aug. 1, 2013) (awarding 28% of $215 million settlement); *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp*, No. 08 CIV. 5310 (DAB), 2019 WL 13150344, at *3 (S.D.N.Y. Mar. 8, 2019), *aff'd as modified sub nom. New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.,* 28 F.4th 357 (2d Cir. 2022) (awarding 28% of $165 million settlement); *Silverman v. Motorola Inc.*, 1:07cv4507, 2012 WL 1597388 (N.D. Ill. 2012) (awarding 27.5% of $200 million settlement).

[22] The *Boeing* derivative case, in which the Court granted an award amounting to 7.69% of a $237.5 million monetary recovery, represents a non-representative outlier result driven purely by an unusual retainer agreement between counsel and the representative plaintiffs capping lead counsel's fee request. *See Boeing* (Ex. 28) Tr. at 61–62 (plaintiffs' counsel informed the Court:

Plaintiffs' counsel's request for 27% of the common fund created is also supported by the "declining percentage principle" that this Court has previously applied.  Under this approach, the percentage of recovery allocated to attorneys' fees decreases as the size of the recovery increases. *See In re Cardinal Health*, 528 F.Supp.2d at 763.  Here, Plaintiffs' requested fee award of 27% of the $180 monetary recovery achieved on behalf of FirstEnergy and its stockholders (inclusive of expenses and service awards) is smaller than the 33.3% awarded in *Community Health*, the next largest derivative settlement in the Sixth Circuit.  *See* Ex. 31.

Moreover, Plaintiffs' fee request is further supported by the unprecedented governance reforms achieved for the benefit of FirstEnergy.  Indeed, the Reforms achieved may ultimately prove even more valuable to FirstEnergy than the monetary consideration.  *Cf. Maher v. Zapata*, 714 F.2d 436, 461 (5th Cir. 1983) (recognizing that the "effects of [a derivative] suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment"); *Pfizer*, 780 F. Supp. 2d at 342 (recognizing corporate governance reform aspects of settlement would "provide considerable corporate benefits … in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have … caused extensive harm to the company").

Recognizing the value of corporate governance reforms achieved in connection with the settlement of shareholder derivative litigation, numerous courts have awarded substantial attorneys' fees even in cases involving *only* internal reforms and no monetary recovery.  For

---

"Your Honor, we're seeking $18,260,000 in total, which is 7.69 percent of the monetary component of the settlement.  And essentially that is – that's based on the contractual arrangement by which we originally took on the case to represent NYSCRF and FPPA. . . . So it's not with reference to any of this court's precedents, which, frankly, I think, would all be on a higher level. But that's what we agreed."); *id.* at 63 (plaintiffs' counsel further acknowledged the requested fee was "far below any metric we are aware of under the case law").

example, in the *L Brands* derivative action, the Southern District of Ohio awarded $21 million in attorneys' fees and approved a settlement resolving breach of fiduciary duty claims in connection with sexual harassment at Victoria's Secret that resulted in the adoption of important governance reforms. *See L Brands*, 2022 WL 1682297, at * 4.  In *In re Facebook Inc. Class C Reclassification Litigation,* the Delaware Court of Chancery awarded $68.7 million in attorneys' fees to plaintiffs' counsel in connection with Facebook's agreement to not reclassify shares and create a new class of non-voting stock.  The resolution of that case involved no cash—instead, Facebook's CEO simply agreed to drop his share reclassification plan.  *See Facebook*, No. 12286-VCL (Del. Ch. Oct. 24, 2018) (Ex. 36).  And in the recent *Alphabet* derivative action*,* the California Superior Court awarded $29 million (with an additional $11 million awarded separately to counsel in the Delaware Court of Chancery) and approved a settlement resolving breach of fiduciary duty claims in connection with Alphabet's discriminatory policies and conduct that resulted in corporate governance and policies reforms.  *See In re Alphabet Inc., S'holder Deriv. Litig.,* Lead Case No. 19-CV-341522, slip op. at 2–5 (Cal. Super. Ct., Santa Clara Cty.  Feb. 5, 2021) (Ex. 37).[23]

Although commendable, Plaintiffs submit that these governance improvements are not nearly as significant as the benefits achieved by the Settlement here.  The Settlement here secured Reforms which, among other things, included the departures of *six* Defendant directors resulting in the immediate passing of ultimate control over the Company's affairs from a Board controlled by directors who served during the pendency of the bribery scheme to a new Board controlled by

---

[23] *See also In re Google Inc. Class C S'holder Litig*., Cons. C.A. No. 7469–CS, tr. at 109 (Del. Ch. Oct. 28, 2013) (Ex. 38) (awarding $8.5 million fee for corporate governance settlement related to recapitalization of Google stock; benefits were "somewhere between a solid single and a double"); *In re Yahoo! S'holders Litig*., C.A. 3561–CC, let. op. at 1 (Del. Ch. Mar. 6, 2009) (awarding $8.4 million for amending employee severance plan in a manner that "made it less expensive to sell Yahoo, making the company a more attractive target to potential suitors") (Ex. 39).

a supermajority of new independent directors. Plaintiffs are unaware of any settlement that has achieved such a profound and immediate favorable change in the composition of the Board members exercising control over a public company. Accordingly, the Reforms achieved by the Settlement provide additional support for the requested Fee and Expense Award. If, for example, the Court were to find that a somewhat smaller fee were appropriate based on the $180 million common fund standing alone (say 25%), the value of the Reforms achieved here would be sufficient to justify the balance of the requested Fee and Expense Award.

### C. The Requested Fee and Expense Award is Consistent with the Public Interest

The second *Ramey* factor (which overlaps with the "public interest" factor for settlement approval, *see* Section IV.I. above) recognizes that rewarding attorneys who prosecute shareholder derivative actions "is important because. . . most individuals would lack the resources to litigate cases, and individual recoveries are often too small to justify the burden and expense of such litigation." *Nationwide*, 2009 WL 8747486, at *14; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions"). If these important societal interests are to be advanced, courts should award fees that will adequately compensate private plaintiffs' attorneys, taking into account the substantial economic risks undertaken by counsel. *Big Lots*, 2018 WL 11356561, at *5 (recognizing that it is in society's interest to have fiduciary laws enforced and that if experienced counsel "were unwilling to take on derivative action lawsuits for fear of not being compensated, it would be more difficult to enforce accountability for officers and directors").

### D. Plaintiffs' Counsel Prosecuted Plaintiffs' Claims on a Wholly-Contingent Basis

The third *Ramey* factor "stands as a proxy for the risk that attorneys will not recover compensation for the work they put into a case." *In re Cardinal Health*, 528 F. Supp. 2d at 766 (citing *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1282 (S.D. Ohio 1996)). "Several courts consider the risk of non-recovery the most important factor in the fee determination." *Id.* Plaintiffs' counsel undertook the prosecution of the Action on a wholly contingent basis, advancing all expenses. From the outset, Plaintiffs' counsel understood that they were embarking on a complex and potentially expensive and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case would require. Joint Decl., ¶95. *See also In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (court entered a judgment against plaintiff after a long breach of duty trial). Undeterred, Plaintiffs' counsel vigorously prosecuted this Action for over 18 months before settling it on exceptionally favorable terms to FirstEnergy and its shareholders. These risks, combined with the substantial benefits achieved, warrant approval of the Fee and Expense Award.

### E. Counsel's Time and Effort Expended Support the Requested Fee and Expense Award

The fourth *Ramey* factor also supports the requested Fee and Expense Award: the request is reasonable when cross-checked against Plaintiffs' counsel's lodestar, which "is used to confirm the reasonableness of the percentage of the fund award." *Connectivity Sys.*, 2011 WL 292008, at *13.

The Joint Declaration details the substantial time and effort that Plaintiffs' counsel Saxena White, Bernstein Litowitz, Cohen Milstein, and John Camillus devoted to the litigation, which included: (i) investigating claims against Defendants and filing the detailed 117-page Complaint; (ii) defeating a motion to dismiss the Complaint in this Court; (iii) intervening in a parallel action

pending in the United States District Court for the Northern District of Ohio and defeating a motion to dismiss in that court; (iv) defeating the SLC's motion to stay discovery, in both this Court, the Northern District of Ohio, and on appeal to the Sixth Circuit; (v) conducting voluminous document discovery, including the review of over 500,000 pages of documents, in anticipation of more than 22 depositions, summary judgment motions, and trial; (vi) consulting with Prof. Gordon on the corporate governance reforms; and (vii) engaging in extended, arm's-length settlement negotiations, including mediation before Judge Phillips. Joint Decl., ¶¶25-58. These litigation efforts resulted in a total lodestar of $11,360,591.25,[24] along with un-reimbursed litigation expenses totaling $228,697.41. Joint Decl., ¶95. (Plaintiffs' counsel are not seeking separate reimbursement for the $228,697.41 in unreimbursed litigation expenses, but instead are seeking an "all-in" fee and expense award of $48.6 million.) As noted, the Fee and Expense Award will also compensate counsel for other plaintiffs, including the named plaintiff in the Northern District Action and the lead plaintiffs in the State Court Action. As described in their attached declarations, counsel's efforts in the Northern District Action included filing a complaint, attending Court hearings, and participating in the mediation and related settlement negotiations. Counsel in the State Court Actions filed initial and consolidated complaints, briefed oppositions to Defendants' motion to dismiss and the SLC's motion to stay, and participated in the mediation and related settlement negotiations, among other things. Counsel for plaintiffs in the *Bloom v. Anderson* case filed in the Southern District filed an initial complaint and undertook certain discrete tasks assigned by Co-Lead Counsel. These additional counsel incurred a total lodestar of $2,362,057.50, along

---

[24] In determining an appropriate "lodestar" figure, a court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Gilbert v. Abercrombie & Fitch, Co.*, No. 2:15-CV-2854, 2016 WL 4159682, at *11 (S.D. Ohio Aug. 5, 2016), *report and recommendation adopted*, No. 2:15-CV-2854, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016).

with un-reimbursed litigation expenses totaling $47,818.53.  Joint Decl., ¶95.  The total lodestar

for all Plaintiff's counsel in the Derivative Actions is $13,722,648.75, with a total of 23,217.55

hours.

The Fee and Expense Award thus equates to a total lodestar multiplier for all counsel of

3.54, which is well within the range of multipliers typically approved by this Court and others in

shareholder derivative and class action matters.   "Because of the inherent risks of litigation, courts

in this district award multipliers of 'between approximately 2.0 and 5.0.'" *Karpik v. Huntington*

*Bancshares Inc.*, 17-CV-1153, 2021 WL 757123, at \*10 (S.D. Ohio Feb. 18, 2021) (internal

citation omitted) (approving 3.3 lodestar multiplier); *see also In re Cardinal Health*, 528 F.Supp.2d

at 767 (approving 5.9 multiplier); *Arp v. Hohla & Wyss Enterprises, LLC*, No. 3:18-CV-119, 2020

WL 6498956, at \*7 (S.D. Ohio Nov. 5, 2020) (approving 5.29 multiplier); *Lowther v. AK Steel*

*Corp.*, No. 1:11-cv-877, 2012 WL 6676131, at \*5 (S.D. Ohio Dec. 21, 2012) (approving 3.06

multiplier and citing cases with multipliers ranging from 4.3 to 8.5).

As set forth in the Fee Declarations, the number of hours expended and the hourly rates

charged by all plaintiffs' counsel are reasonable.  *See* Exs.6-17; *Gilbert*, 2016 WL 4159682, at \*13

(finding counsel's investigation, complexity of case, and results achieved supported

reasonableness of number of hours expended by plaintiff's counsel).  Moreover, the hourly rates

charged by Plaintiffs' Counsel are within the range of hourly rates previously approved by courts

in this District.  *See Karpik*, 2021 WL 757123, at \*10 (approving hourly rates for partners up to

$875 in an ERISA class action based on the prevailing rates of similarly specialized ERISA

counsel); *Big Lots*, 2018 WL 11356561, at \*5 (approving hourly rates of up to $925 for partners

and $650 for associates for out-of-town counsel), *Big Lots*, No. 2:12–cv–445, ECF No. 122-3 at

PAGEID #: 2760 (identifying approved hourly rates); *L Brands*, 2022 WL 1682297, at \*5

(approving hourly rates of up to $1,685 for partners and $1,245 for associates), *L Brands*, 2:20-cv-03068, ECF No. 26-9 at PAGEID #: 1080 (identifying approved hourly rate).

### F. The Complexity of the Litigation Supports the Requested Fee and Expense Award

The fifth *Ramey* factor, "the complexity of the litigation," overlaps with the second settlement approval factor, "the complexity, expense and likely duration of the litigation." As discussed in detail in Section V.D. above, Plaintiffs identified a number of risks inherent in proceeding with this complex litigation. These risks include, among other things, the difficulty of litigating director oversight claims in general, and in particular Ohio's "clear and convincing evidence" standard for director and officer breach of fiduciary duty claims; other Ohio statutory protections for director and officer conduct; difficulties in ascertaining damages; recoverability issues based on eroding D&O insurance; the possibility that the SLC could recommend the termination of some or all of Plaintiffs' claims; and other risks inherent in complex litigation, such as motions for summary judgment, battles of the experts, a lengthy trial, and post-trial litigation and appeals. Derivative actions involve "highly-specialized and complex areas of law, which supports the requested fee and expense award," given that such claims implicate "complex questions of law and fact, including the fiduciary duties owed by [FirstEnergy] directors to their shareholders." *Nationwide*, 2009 WL 8747486, at *15. "All else equal, litigation that is challenging and complex supports a higher fee award." *Activision*, 124 A.3d at 1072. As such, this *Ramey* factor also supports the Fee and Expense Award.

### G. The Involvement of Highly Experienced Counsel Supports the Requested Fee and Expense Award

Plaintiffs' counsel are highly experienced and skilled practitioners in the field of securities litigation, and the firms have long and successful track records in derivative and securities cases throughout the country, including within this District. Joint Decl. ¶94.

Moreover, FirstEnergy, the SLC, and Defendants are represented by highly experienced and prestigious law firms, including Jones Day, Baker & Hostetler LLP, Skadden, Arps, Slate, Meagher & Flom, McDermott, Will & Emery, LLP, Ballard Spahr LLP, Morgan, Lewis & Bockius, Boies Schiller Flexner LLP, Walter Haverfield, and Tucker Ellis LLP, who vigorously represented their clients.  Joint Decl., ¶¶39.  In the face of this experienced, formidable, and well-financed opposition, Plaintiffs' Counsel were able to successfully prosecute a case that resulted in an exceptional result for FirstEnergy and its shareholders.  *See*, *e.g.*, *Nationwide*, 2009 WL 8747486, at *7, 15 (noting "highly experienced" plaintiffs' counsel, coupled with a "formidable opposition [including] very skilled and experience counsel in securities and transactional litigation, who could draw upon the exceptional resources of their national recognized law firm[ ] . . . [are] factor[s] that may be considered when evaluating a fee request.").  As Judge Phillips stated in his Declaration, "the advocacy on both sides of the case was excellent.  All counsel displayed the highest level of professionalism in zealously and capably representing their respective clients." Phillips Decl., ¶14.

## VI.  THE REQUESTED SERVICE AWARDS ARE APPROPRIATE AND SHOULD BE APPROVED

Service "awards are efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003).  Notably, "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *L Brands*, 2022 WL 1682297, at *6 (quoting *Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933, at *7 (N.D. Ohio Mar. 8, 2010).

Here, Plaintiffs St. Louis, Local 103 and MLPF closely monitored and actively participated in all stages of this case, including overseeing the work of litigation counsel in this action, receiving

regular updates concerning the status of the litigation from its inception to the present, reviewing significant filings and Court orders, dedicating significant time and energy responding to discovery served by the Defendants in this action, including six sets of interrogatories (including 104 separate interrogatories), six sets of document requests (including 77 separate requests), and three sets of requests for admission (totaling 44 separate requests), and overseeing settlement discussions.  Each Plaintiff has submitted a declaration detailing its involvement in overseeing the prosecution of this litigation.  *See* Exs.18–20.  Plaintiffs also understand that the named plaintiff in the Northern District Action (Jennifer Miller) and the lead plaintiffs in the State Court Action (John Gendrich and Robert Sloan) have had significant involvement in overseeing their respective actions which contributed in part to the result achieved and which will be released by the Settlement, based on declarations those plaintiffs have likewise prepared and submitted.  *See* Exs. 21–23.  Accordingly, Plaintiffs seek service awards of $10,000 each for St. Louis, Local 103, MLPF, Ms. Miller, and Messrs. Gendrich and Sloan for stepping forward to pursue and oversee these societally important actions.   Significantly, if approved, the Service Awards will be paid to the various plaintiffs from any Court-approved Fee and Expense Award.  Joint Decl., ¶95.  The approval of the requested Service Awards will, therefore, not serve to reduce the total amount of the recovery received by FirstEnergy net of any Fee and Expense Award.

This request is reasonable when compared with other awards in this District.  *See, e.g.*, *L Brands*, 2022 WL 1682297, at *6 (approving $10,000 service awards to each of four representative plaintiffs); *Rotondo v. JPMorgan Chase Bank, N.A.*, No. 2:19-CV-2328, 2019 WL 6167086, at *9 (S.D. Ohio Nov. 20, 2019), *report and recommendation adopted*, No. 19-CV-02328, 2019 WL 6496806 (S.D. Ohio Dec. 2, 2019) (approving $20,000 service award).

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant final approval of the Proposed Settlement; approve the Fee and Expense Award of $48,600,000; and approve the requested Service Awards.

Dated: July 7, 2022                              Respectfully submitted,

*/s/ John C. Camillus*
**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
Phone: (614) 992-1000
jcamillus@camilluslaw.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Maya Saxena
Joe E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Phone: (561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

**SAXENA WHITE P.A.**
Thomas Curry
Tayler D. Bolton
1000 N. West Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 485-0480
tcurry@saxenawhite.com
tbolton@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer
Sara DiLeo
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
ssinger@saxenawhite.com
sdileo@saxenawhite.com

- and -

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jeroen van Kwawegen
Alla Zayenchik
Margaret Sanborn-Lowing
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
jeroen@blbglaw.com
alla.zayenchick@blbglaw.com
margaret.lowing@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Daniel S. Sommers
Molly J. Bowen
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
mbowen@cohenmilstein.com

- and -

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Christopher Lometti
Richard A. Speirs
Amy Miller
88 Pine Street, 14th Floor
New York, NY 10005

Telephone: (212) 838-7797
Facsimile: (212) 838 7745
clometti@cohenmilstein.com
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

*Counsel for Additional Plaintiff Massachusetts
Laborers Pension Fund*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 7, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys on record.


*/s/ John C. Camillus*
John C. Camillus